[No. A114099. First Dist., Div. Three. Apr. 11, 2007.]

THE PEOPLE, Plaintiff and Respondent, v.
JAMES MICHAEL KARRIKER, Defendant and Respondent;
JO WEBER, as Public Conservator, etc., Objector and Appellant.

## Counsel

Steven M. Woodside, County Counsel, and William L. Adams, Deputy County Counsel, for Objector and Appellant.

Jennifer B. Henning for California State Association of Counties and the California Association of Public Administrators, Public Guardians and Public Conservators as Amici Curiae on behalf of Objector and Appellant.

No appearance for Plaintiff and Respondent.

Jeremy Price, under appointment by the Court of Appeal, for Defendant and Respondent.

## Opinion

**POLLAK, J.**—The Sonoma County Public Conservator (the Conservator) appeals from an order entered in criminal proceedings directing her to file a petition to establish a conservatorship under the Lanterman-Petris-Short Act, Welfare and Institutions Code sections 5000 et seq. (the LPS Act or Act),[1] for an incompetent defendant. The Conservator contends that while the court is authorized to refer the defendant to her office for a conservatorship investigation, the court lacks jurisdiction to order her to file the petition if, as occurred here, she determines that the individual does not meet the requirements for a conservatorship under the Act. We agree with the Conservator and shall reverse the trial court's order.

### Factual and Procedural Background

On April 13, 2004, then 45-year-old James Michael Karriker was charged by complaint with one felony count of making a criminal threat (Pen. Code, § 422) and one misdemeanor count of battery (Pen. Code, § 242), apparently arising out of a dispute with his mother. Doubts concerning Karriker's competency to stand trial having arisen prior to the preliminary hearing, the court appointed Dr. John Watts Podboy to examine Karriker pursuant to Penal Code section 1368. Dr. Podboy reported to the court that Karriker was "most assuredly not competent to stand trial" and that "it appears as though it would be a difficult matter to restore this individual to competence." On May 12, 2004, the court found Karriker mentally incompetent to stand trial and suspended the criminal proceedings. Karriker was committed to the Napa State Hospital "for care and treatment . . . until he becomes mentally competent and able to assist in his own defense, with a maximum term of 3

---

[1] All statutory references are to the Welfare and Institutions Code unless otherwise noted.

(three) years," which is the maximum period of confinement permissible under the criminal competency statute.

On October 27, 2005, staff at the Napa State Hospital reported that "Mr. Karriker continues to manifest a mental illness, which would interfere with his ability to understand the nature of the criminal proceedings or to assist counsel in the conduct of his defense in a rational manner." The report advised that "there is no substantial likelihood that he will regain mental competence in the foreseeable future" and recommended that the defendant "be placed on an LPS Conservatorship as [he is] still not competent and [is] gravely disabled pursuant to Section 5350 of the Welfare and Institutions Code."

On November 28, 2005, the court ordered defendant to be examined by the Conservator. Pursuant to the court's order, Karriker was examined by a psychiatrist. Based on the psychiatrist's report, the Conservator concluded that there was "insufficient evidence to justify filing a petition for LPS conservatorship for Mr. Karriker. Currently he does not present as gravely disabled. The undersigned's conclusion is based on the lack of evidence that Mr. Karriker is unable to provide for his basic needs of food, clothing, or shelter as a result of a mental disorder or that he is presently unable or unwilling to accept treatment voluntarily." The Conservator explained that according to the investigating psychiatrist, "Mr. Karriker suffers from Amnestic Disorder due to a head injury and chronic alcoholism and alcohol dependence." The doctor found "no evidence of psychosis and [Mr. Karriker] does not have a primary psychiatric illness at this time." Finally, the letter states that the matter had "been referred to the Public Guardian program to determine if Mr. Karriker's situation is appropriate for a probate conservatorship." A subsequent letter to the court from the office of the public guardian explains that because defendant suffers from alcohol-induced dementia he would require placement in a secured skilled nursing facility, but that neither of the two facilities contacted by the office had a bed available for Medi-Cal patients. The letter concludes that "[i]n the absence of an appropriate setting to meet Mr. Karriker's needs, establishment of a probate conservatorship would be inappropriate."

On March 13, 2006, Karriker filed a motion requesting the court to order the Conservator to file a petition to establish an LPS conservatorship. Karriker contended that based on the plain language of Penal Code section 1370, subdivision (c)(2), the court could order the Conservator to file the petition if it determined that he appears gravely disabled. In response, the Conservator argued that the court's authority is limited to requiring an evaluation of defendant by the Conservator to determine the suitability of an

LPS conservatorship. The ultimate decision to file a petition requesting conservatorship, she argued below and reasserts here, is vested in her sole discretion.

At the hearing, the court expressed its concern that if the Conservator refused to file a petition under the LPS Act and Karriker was not returned to competency before expiration of his three-year commitment to the state hospital, the criminal proceedings would be dismissed and he would be "free to wander the streets with unresolved criminal matters, matters in which he threatened the life of other people." The Conservator acknowledged this concern but explained that a "conservatorship is not a mechanism for keeping dangerous people off the streets. The point of [the] conservatorship is to take care of people who can't take care of themselves. [¶] . . . [¶] We just don't believe it's appropriate to place someone in an institute for mental disease perhaps . . . for their lifetime when they can't be treated there." The Conservator suggested that the proper solution for Karriker because of his dementia would be a less restrictive Probate Code conservatorship and placement in a secured skilled nursing facility.

On April 14, 2006, the court issued an order and statement of decision. The court explained, "The Public Conservator argues that Mr. Karriker does not qualify for LPS . . . Conservatorship. If he could not be placed in some type of conservatorship, the court would be placed in a very peculiar position. It appears to be undisputed that Mr. Karriker suffers, at the very least, from alcohol-related dementia and is in need of a probate conservatorship in a 'secured perimeter' facility. Unfortunately since there is none available, the probate conservator refuses to act. Assuming that Mr. Karriker is not conservatorized then since he clearly remains incompetent to stand trial, he must be released from any facility at the end of 3 years. His felony charges remain unresolved and he is virtually free to roam the streets and commit new felonies with the assurance that he cannot be tried. Such a state of affairs cannot be the intention of the Legislature." The court acknowledged that there may be conflicting evidence regarding whether Karriker meets the criteria for conservatorship under the LPS Act, but concluded that "[i]t is not the conservator's duty to be the final arbiter of the defendants or society's status and needs. That is a job for a judge who is able to dispassionately review the conflicting evidence and decide the case." Accordingly, the court directed the Conservator to file a petition to establish an LPS conservatorship for Karriker. The Conservator filed a timely notice of appeal.

## Discussion

### 1. *Appealability of the Order*

Initially, Karriker contends that this appeal should be dismissed because the trial court's order is not appealable. " 'A reviewing court has jurisdiction over a direct appeal only when there is (1) an appealable order or (2) an appealable judgment.' [Citations.] 'A trial court's order is appealable when it is made so by statute.' [Citation.] 'The theory is that piecemeal disposition and multiple appeals in a single action would be oppressive and costly, and that a review of intermediate rulings should await the final disposition of the case.' " (*Conlan v. Shewry* (2005) 131 Cal.App.4th 1354, 1365 [32 Cal.Rptr.3d 667].)

The trial court here noted, correctly we believe, that Karriker's motion to compel the Conservator to file a petition under the LPS Act was "in effect a request for review by mandate" of the Conservator's refusal to file the petition. The trial court treated the motion as such and ordered the Conservator to file the petition. A judgment granting a petition for writ of mandate is a final judgment appealable under Code of Civil Procedure section 904.1, subdivision (a)(1). (E.g., *Alliance for a Better Downtown Millbrae v. Wade* (2003) 108 Cal.App.4th 123, 128 [133 Cal.Rptr.2d 249].) The court's order is not interlocutory. The order finally disposes of the single issue raised in what the trial court treated as a petition for a writ of mandate—whether to require the Conservator to file the petition. Although compliance with the order would lead to conservatorship proceedings and a determination as to whether Karriker is conservable—which order would be final and appealable—the issue of whether Karriker should be conserved is in a real sense collateral to the question resolved by the present order. A determination that Karriker is not conservable, as the Conservator argues, would not vindicate her position that the court has no authority to compel her to file the conservatorship petition.[2] Even if the order should be regarded as interlocutory, a reviewing court has discretion to consider an appeal from a judgment granting a petition for a writ of mandate when related issues remain undecided. (*Sierra Club v. County of Sonoma* (1992) 6 Cal.App.4th 1307, 1312–1313, fn. 1 [8 Cal.Rptr.2d 473]; see also *McClure v. County of San Diego* (1987) 191 Cal.App.3d 807, 811 [236 Cal.Rptr. 653]; *Highland Development Co. v. City of Los Angeles* (1985) 170 Cal.App.3d 169, 178–179 [215 Cal.Rptr. 881].)

---

[2] Furthermore, because Karriker is not opposing the appointment, the Conservator is the only party that might be expected to appeal from an order establishing a conservatorship. But such an appeal would be challenging the propriety of an order granting relief requested in her own petition, and thus would be subject to a motion to dismiss on the ground that she lacked standing as an aggrieved party. (Code Civ. Proc., § 902.)

Accordingly, we shall review the court's order consistent with the rules applicable to an appeal from a judgment granting a petition for a writ of mandate.

## 2. Standard of Review

In general, "[m]andamus will not lie to control an exercise of discretion, i.e., to compel an official to exercise discretion in a particular manner." (*Common Cause v. Board of Supervisors* (1989) 49 Cal.3d 432, 442 [261 Cal.Rptr. 574, 777 P.2d 610].) Mandamus will lie, however, "to compel a public official to perform an official act required by law." (*Ibid.*) "Code of Civil Procedure section 1085, providing for writs of mandate, permits challenges to ministerial acts by local officials. To obtain such a writ, the petitioner must show (1) a clear, present, ministerial duty on the part of the respondent and (2) a correlative clear, present, and beneficial right in the petitioner to the performance of that duty. [Citations.] A ministerial duty is an act that a public officer is obligated to perform in a prescribed manner required by law when a given state of facts exists. [Citations.] [¶] On appeal following a trial court's decision on a petition for a writ of mandate, the reviewing court ' "need only review the record to determine whether the trial court's findings are supported by substantial evidence." ' [Citations.] However, we review questions of law independently. [Citation.] Where . . . the facts are undisputed and the issue involves statutory interpretation, we exercise our independent judgment and review the matter de novo." (*Alliance for a Better Downtown Millbrae v. Wade, supra,* 108 Cal.App.4th at pp. 128–129.)

" 'Whether a particular statute is intended to impose a mandatory duty is a question of interpretation for the courts. [Citations.]' [Citation.] '[S]tatutes must be given a reasonable construction that conforms to the apparent purpose and intention of the law makers . . . , and the various parts of the statutory enactment must be harmonized by considering the particular clause in the context of the whole statute.' [Citation.] In matters of statutory construction, our fundamental concern is legislative intent." (*Bradley v. Lacy* (1997) 53 Cal.App.4th 883, 889 [61 Cal.Rptr.2d 919].)

## 3. The Relevant Statutes

### LPS Conservatorship Statute

Chapter 3 of the LPS Act, beginning with section 5350, authorizes the creation of a renewable one-year conservatorship (§ 5361) for persons who

are gravely disabled as a result of a mental disorder.[3] The Act provides two alternative definitions of "gravely disabled." Under section 5008, subdivision (h)(1)(A), gravely disabled is defined as "[a] condition in which a person, as a result of a mental disorder, is unable to provide for his or her basic personal needs for food, clothing, or shelter." Under section 5008, subdivision (h)(1)(B), gravely disabled is defined as "[a] condition in which a person, has been found mentally incompetent under Section 1370 of the Penal Code and all of the following facts exist: [¶] (i) The indictment or information pending against the defendant at the time of commitment charges a felony involving death, great bodily harm, or a serious threat to the physical well-being of another person. [¶] (ii) The indictment or information has not been dismissed. [¶] (iii) As a result of mental disorder, the person is unable to understand the nature and purpose of the proceedings taken against him or her and to assist counsel in the conduct of his or her defense in a rational manner" (§ 5008, subd. (h)(1)(B)). A conservatorship imposed under the second definition is commonly referred to as a "Murphy conservatorship" after the legislator who sponsored the amendment that added the definition to the Act in 1974. (Stats. 1974, ch. 1511, pp. 3316–3324.) ■ Under either definition, imposition of an LPS conservatorship is authorized only if the individual's impairment is the result of a "mental disorder."[4]

■ The Murphy conservatorship was added to "address the difficult problem of integrating and resolving the conflicting concerns of protecting society from dangerous individuals who are not subject to criminal prosecution, preserving a libertarian policy regarding the indefinite commitment of mentally incompetent individuals who have yet to be convicted of criminal conduct, and safeguarding the freedom of incompetent criminal defendants who present no threat to the public." (*People v. Skeirik* (1991) 229 Cal.App.3d 444, 456 [280 Cal.Rptr. 175].) In *People v. Skeirik*, the court explained that "[u]ntil 1973, if an individual was found incompetent to stand trial he was

---

[3] Other parts of the LPS Act authorize a limited period of intensive treatment and evaluation for a person who is a danger to himself or herself or to others or is gravely disabled. Under section 5150, a person may be detained for a 72-hour treatment and evaluation period. Thereafter, additional intervals of intensive treatment may be ordered if the person continues to be dangerous or gravely disabled and he or she refuses voluntary treatment. (§§ 5250, 5300.) The involuntary detention period for a gravely disabled person, however, "shall not exceed 47 days unless continuance is granted." (§ 5352.3; see § 5258.) These temporary confinement procedures were not utilized in the present action since Karriker was committed for evaluation and treatment under the provisions of the Penal Code (Pen. Code, §§ 1368–1370).

[4] "The term 'mental disorder' is not defined in the LPS Act. In *Conservatorship of Chambers* (1977) 71 Cal.App.3d 277, 282 [139 Cal.Rptr. 357], the court stated that '[t]he term "mental disorder" is limited to those disorders listed by the American Psychiatric Association in its Diagnostic and Statistical Manual of Mental Disorders [(DSM)]. (Cal. Admin. Code, tit. 9, § 813).' " "Although this regulation has since been repealed, the practice has been to continue using the same definition." (2 Cal. Conservatorships & Guardianships (Cont.Ed.Bar 2004) § 15.17, pp. 917–918.)

committed to a state hospital or other treatment facility until he attained the capacity to stand trial. [Citation.] If he never attained the requisite competency, his commitment operated as a life sentence. It made no difference whether he was charged with murder or petty theft. [¶] In 1973 the Supreme Court put an end to the then existing scheme for commitment of incompetent criminal defendants by holding in *In re Davis* (1973) 8 Cal.3d 798 [106 Cal.Rptr. 178, 505 P.2d 1018], that when there is no reasonable likelihood that a criminal defendant will regain competence to stand trial in the foreseeable future, he must either be released or subjected to commitment proceedings initiated pursuant to civil commitment laws as embodied in the Lanterman-Petris-Short Act . . . . [¶] At the time *Davis* was decided long-term involuntary commitment under the LPS Act was imposed only upon individuals categorized as 'gravely disabled.' [Citation.] However, the LPS Act contained no specific provision for commitment of criminal defendants who were found incompetent to stand trial. While such defendants may have fit into the category of persons who are a danger to themselves or others so that short term commitments under the LPS Act were possible, they would not necessarily fit into the category of 'gravely disabled' persons necessary for long-term commitment. Thus, if the LPS Act were used to commit incompetent criminal defendants, the maximum period of commitment would typically be ninety days. [¶] The Legislature responded by enacting a new commitment scheme which became effective in September 1974 as an urgency measure. [Citation.] . . . As a result of this effort, criminal defendants found incompetent to stand trial are now subject to an initial commitment for a definitely limited period not to exceed three years. Thereafter, any further commitment may occur only if the defendant falls within the new standards set forth in the LPS Act." (*People v. Skeirik, supra,* 229 Cal.App.3d at pp. 456–457, fn. 13.)

■ In 1980, the California Supreme Court held that in order to impose a Murphy conservatorship the trial court must find, in addition to the explicit statutory elements, that "by reason of a mental disease, defect, or disorder, the person represents a substantial danger of physical harm to others." (*Conservatorship of Hofferber* (1980) 28 Cal.3d 161, 176–177 [167 Cal.Rptr. 854, 616 P.2d 836] (*Hofferber*).) ■ The court explained that in *Jackson v. Indiana* (1972) 406 U.S. 715 [32 L.Ed.2d 435, 92 S.Ct. 1845], the United States Supreme Court held that the equal protection clause of the Fourteenth Amendment to the United States Constitution prohibits the state from subjecting a person, solely because of pending criminal charges, to commitment standards more lenient or release standards more stringent than those applicable to persons not charged with criminal offense. (*Hofferber, supra,* 28 Cal.3d at p. 167.) The *Hofferber* court held that the state's "compelling interests in public safety and in humane treatment of the mentally disturbed"

justified the "separate treatment of permanently incompetent criminal defendants formally charged with violent felonies." (*Id.* at pp. 171, 173.) The court concluded "that under a separate statutory scheme the state may confine incompetent criminal defendants, *on grounds that they remain violently dangerous*, when a magistrate or grand jury has found probable cause to believe that they have committed violent felonies." (*Id.* at p. 174.)

Conservatorship proceedings may be initiated under the LPS Act in several ways. "When the professional person in charge of an agency providing comprehensive evaluation or a facility providing intensive treatment determines that a person in his care is gravely disabled as a result of mental disorder . . . and is unwilling to accept, or incapable of accepting, treatment voluntarily, he may recommend conservatorship to the officer providing conservatorship investigation of the county of residence of the person prior to his admission as a patient in such facility." (§ 5352.) Additionally, "[c]onservatorship proceedings may be initiated for any person committed to a state hospital . . . pursuant to Section . . . 1370 of the Penal Code . . . upon recommendation of the medical director of the state hospital . . . to the conservatorship investigator of the county of residence of the person prior to his or her admission to the hospital." (§ 5352.5.) And, as directly relevant in the present case, Penal Code section 1370 authorizes the court to order the conservatorship investigator to initiate conservatorship proceedings.[5]

Once such a recommendation or court order has been made, the conservatorship investigator, who in this case is the public conservator (see § 5351; <http://www.sonoma-county.org/human/adult_aging.htm#pub_admin.> [as of Apr. 11, 2007]), must conduct an investigation. "If the officer providing conservatorship investigation concurs with the recommendation, he shall petition the superior court in the county of residence of the patient to establish conservatorship." (§ 5352.) "The officer providing conservatorship investigation shall investigate all available alternatives to conservatorship and shall recommend conservatorship to the court only if no suitable alternatives are available." (§ 5354.) The discretion to file a petition for the appointment of an

---

[5] Penal Code section 1370, subdivision (c)(2) provides in relevant part, "Whenever any defendant is returned to the court pursuant to paragraph (1) or (2) of subdivision (b) or paragraph (1) of this subdivision and it appears to the court that the defendant is gravely disabled, as defined in subparagraph (B) of paragraph (1) of subdivision (h) of Section 5008 of the Welfare and Institutions Code, the court shall order the conservatorship investigator of the county of commitment of the defendant to initiate conservatorship proceedings for the defendant pursuant to Chapter 3 (commencing with Section 5350) of Part 1 of Division 5 of the Welfare and Institutions Code. Any hearings required in the conservatorship proceedings shall be held in the superior court in the county that ordered the commitment."

LPS conservator is vested in the sole discretion of the conservatorship investigator. (*Kaplan v. Superior Court* (1989) 216 Cal.App.3d 1354, 1359–1361 [265 Cal.Rptr. 408] (*Kaplan*).)[6]

■ Once appointed, a conservator is vested with "the care, custody, and control of, . . . [the] conservatee." (Prob. Code, § 2351; see Welf. & Inst. Code, § 5357.) "When ordered by the court after the hearing required by this section, a conservator appointed pursuant to this chapter shall place his or her conservatee as follows: [¶] (A) For a conservatee who is gravely disabled, as defined in subparagraph (A) of paragraph (1) of subdivision (h) of Section 5008, in the least restrictive alternative placement, as designated by the court. [¶] (B) For a conservatee who is gravely disabled, as defined in subparagraph (B) of paragraph (1) of subdivision (h) of Section 5008, in a placement that achieves the purposes of treatment of the conservatee and protection of the public." (§ 5358, subd. (a)(1)(A), (B).)

■ "Conservatorship initiated pursuant to this chapter shall automatically terminate one year after the appointment of the conservator by the superior court. . . . If upon the termination of an initial or a succeeding period of conservatorship the conservator determines that conservatorship is still required, he may petition the superior court for his reappointment as conservator for a succeeding one-year period." (§ 5361.) "If the conservator does not petition to reestablish conservatorship at or before the termination of the one-year period, the court shall issue a decree terminating conservatorship." (§ 5362, subd. (b).) In *Conservatorship of Martha P.* (2004) 117 Cal.App.4th 857, 868 [12 Cal.Rptr.3d 142], the court held that the conservator has the absolute discretion to dismiss a petition to reestablish an LPS conservatorship, even over the objection of the conservatee.

■ The California Supreme Court has long "recognized that civil commitment to a mental hospital, despite its civil label, threatens a person's liberty and dignity on as massive a scale as that traditionally associated with criminal prosecutions." (*Conservatorship of Roulet* (1979) 23 Cal.3d 219, 223

---

[6] "If the conservatorship investigation results in a recommendation for conservatorship, the recommendation shall designate the most suitable person, corporation, state or local agency or county officer, or employee designated by the county to serve as conservator." (§ 5355.) "The public guardian shall serve as conservator of any person found by a court under this chapter to be gravely disabled, if the court recommends the conservatorship after a conservatorship investigation, and if the court finds that no other person or entity is willing and able to serve as conservator." (§ 5354.5.) "In appointing a conservator, as defined in subparagraph (B) of paragraph (1) of subdivision (h) of Section 5008, the court shall consider the purposes of protection of the public and the treatment of the conservatee. Notwithstanding any other provision of this section, the court shall not appoint the proposed conservator if the court determines that appointment of the proposed conservator will not result in adequate protection of the public." (§ 5350, subd. (b)(2).)

[152 Cal.Rptr. 425, 590 P.2d 1] ["The appointment of a conservator for appellant and her subsequent confinement in a mental hospital against her will deprived appellant of freedom in its most basic aspects and placed a lasting stigma on her reputation"].) "[T]hese statutes assure in many cases an unbroken and indefinite period of state-sanctioned confinement. 'The theoretical maximum period of detention is *life* as successive petitions may be filed . . . .' " (*Id.* at p. 224.) Accordingly, "[t]he person for whom conservatorship is sought shall have the right to demand a court or jury trial on the issue of whether he or she is gravely disabled" (§ 5350, subd. (d)) and the court or jury must determine grave disability by proof beyond a reasonable doubt. (*Conservatorship of Roulet, supra,* 23 Cal.3d at p. 235; *Hofferber, supra,* 28 Cal.3d at pp. 178–180 [to impose a Murphy conservatorship, the trier of fact must find that defendant is incompetent to stand trial by reason of a mental disorder by a preponderance of the evidence and that he or she is currently dangerous as a result of the mental disorder by proof beyond a reasonable doubt].)

### *Conservatorship Under the Probate Code*

 The Probate Code provides an alternative and less intrusive form of conservatorship "for a person who is unable to provide properly for his or her personal needs for physical health, food, clothing, or shelter." (Prob. Code, § 1801, subd. (a).) Unlike an LPS conservatorship, the Probate Code does not require that the proposed conservatee's inability to care for himself or herself be the result of a mental disorder. The purpose of this type of conservatorship is, among other things, to "(a) Protect the rights of persons who are placed under conservatorship. [¶] (b) Provide that an assessment of the needs of the person is performed in order to determine the appropriateness and extent of a conservatorship and to set goals for increasing the conservatee's functional abilities to whatever extent possible. [¶] (c) Provide that the health and psychosocial needs of the proposed conservatee are met. [¶] (d) Provide that community-based services are used to the greatest extent in order to allow the conservatee to remain as independent and in the least restrictive setting as possible. [¶] (e) Provide that the periodic review of the conservatorship by the court investigator shall consider the best interests of the conservatee. [¶] [And] (f) Ensure that the conservatee's basic needs for physical health, food, clothing, and shelter are met." (Prob. Code, § 1800, subds. (a)–(f).)

 A petition for the appointment of a conservator under the Probate Code may be filed by the proposed conservatee, his or her spouse or domestic partner, a relative of the proposed conservatee, any interested state or local agency or public officer or employee, or any other interested person or friend of the proposed conservatee. (Prob. Code, § 1820, subd. (a).) A probate conservator is vested with the "care, custody and control of . . . the

conservatee" and "may establish the residence of the conservatee at any place within this state without the permission of the court." (Prob. Code, §§ 2351, subd. (a), 2352, subd. (b).) The conservator, however, must "select the least restrictive appropriate residence . . . that is available and necessary to meet the needs of the conservatee, and that is in the best interests of the conservatee." (Prob. Code, § 2352, subd. (b).) In addition, unlike the situation with an LPS conservatorship, a probate conservatee cannot be placed in a mental health treatment facility against his or her will. (Prob. Code, § 2356, subd. (a).) "The primary difference between a Probate Code conservator and an LPS conservator is the LPS conservator's power to place the conservatee in a locked facility, an action that a Probate Code conservator cannot take." (1 Cal. Conservatorships & Guardianships, *supra*, § 1.11 at pp. 14–15.)

Nonetheless, the Probate Code contains provisions dealing specifically with persons with dementia; a probate conservator may authorize the placement of a conservatee who suffers from dementia in a "locked and secured nursing facility which specializes in the care and treatment of people with dementia" if certain requirements are met. (Prob. Code, § 2356.5, subd. (b).)[7] Because "[t]he deprivation of liberty and stigma which attaches under a probate conservatorship is not as great as under an LPS conservatorship" the inability to care for one's personal needs need be established by only clear and convincing evidence. (*Conservatorship of Sanderson* (1980) 106 Cal.App.3d 611, 620 [165 Cal.Rptr. 217]; Prob. Code, § 1801, subd. (e).)

### *Penal Code Section 1370*

Under Penal Code section 1367, subdivision (a), "A person cannot be tried or adjudged to punishment while that person is mentally incompetent." Penal Code section 1370, which governs criminal procedure following a finding that a defendant is incompetent to stand trial, is applicable "to a person who is charged with a felony and is incompetent as a result of a mental disorder." (Pen. Code, § 1367, subd. (b).) Penal Code section 1370 authorizes the court to commit an incompetent defendant to a state mental hospital for a period of no more than three years. (Pen. Code, § 1370, subds. (a), (c).)[8] Once committed, reports charting the defendant's progress must be

---

[7] This exception is based in part on legislative findings "[t]hat people with dementia, as defined in the last published edition of the 'Diagnostic and Statistical Manual of Mental Disorders,' should have a conservatorship to serve their unique and special needs. [¶] [And] [t]hat, by adding powers to the probate conservatorship for people with dementia, their unique and special needs can be met. This will reduce costs to the conservatee and the family of the conservatee, reduce costly administration by state and county government, and safeguard the basic dignity and rights of the conservatee." (Prob. Code, § 2356.5, subd. (a)(1), (2).)

[8] Penal Code section 1370, subdivision (a)(1)(B), provides in relevant part: "If the defendant is found mentally incompetent, the trial or judgment shall be suspended until the person becomes mentally competent. [¶] (i) In the meantime, the court shall order that the mentally incompetent defendant be delivered by the sheriff to a state hospital for the care and treatment

filed with the court at statutorily provided intervals. If the medical staff determines that there is no substantial likelihood that the defendant will regain mental competence in the foreseeable future, the defendant must be returned to the court for further proceedings. (Pen. Code, § 1370, subds. (b) & (c).)[9] If at that time "it appears to the court that the defendant is gravely disabled, as defined in subparagraph (B) of paragraph (1) of subdivision (h) of Section 5008 of the Welfare and Institutions Code, the court shall order the conservatorship investigator of the county of commitment of the defendant to initiate conservatorship proceedings for the defendant pursuant to Chapter 3 (commencing with Section 5350) of Part 1 of Division 5 of the Welfare and Institutions Code." (Pen. Code, § 1370, subd. (c)(2).)[10] Alternatively, the court can dismiss the charges and order the defendant released. (Pen. Code, § 1370, subd. (e); *In re Davis, supra,* 8 Cal.3d 798, 806 ["if petitioners are making no reasonable progress toward that goal [restoring competency], they must be released or held subject to alternative commitment procedures"].)

---

of the mentally disordered . . . ." Subdivision (c)(1) of section 1370 provides: "At the end of three years from the date of commitment or a period of commitment equal to the maximum term of imprisonment provided by law for the most serious offense charged in the information, indictment, or misdemeanor complaint, whichever is shorter, a defendant who has not recovered mental competence shall be returned to the committing court."

The maximum term of imprisonment for the felony of which Karriker is accused is three years. (Pen. Code, §§ 242, 422.) Thus, even if Karriker were restored to competency and tried at the conclusion of his three-year term at the Napa State Hospital, he could not be sentenced to any additional prison time. (Pen. Code, § 1375.5.)

[9] Penal Code section 1370, subdivision (b)(1) provides: "Within 90 days of a commitment made pursuant to subdivision (a), the medical director of the state hospital or other treatment facility to which the defendant is confined shall make a written report to the court and the community program director for the county or region of commitment, or a designee, concerning the defendant's progress toward recovery of mental competence. . . . If the defendant has not recovered mental competence, but the report discloses a substantial likelihood that the defendant will regain mental competence in the foreseeable future, the defendant shall remain in the state hospital or other treatment facility or on outpatient status. Thereafter, at six-month intervals or until the defendant becomes mentally competent, where the defendant is confined in a treatment facility, the medical director of the hospital or person in charge of the facility shall report in writing to the court and the community program director or a designee regarding the defendant's progress toward recovery of mental competence. . . . If the report indicates that there is no substantial likelihood that the defendant will regain mental competence in the foreseeable future, the committing court shall order the defendant to be returned to the court for proceedings pursuant to paragraph (2) of subdivision (c)."

[10] Penal Code section 1370.01, subdivision (c)(2) contains similar provisions for an incompetent defendant in a misdemeanor action, except that the court is authorized to order the initiation of conservatorship proceedings if it appears "that the defendant is gravely disabled, as defined in subparagraph (A) of paragraph (1) of subdivision (h) of Section 5008 of the Welfare and Institutions Code," i.e., if it appears that as a result of a mental disorder the defendant is unable to provide for his or her personal needs for food, clothing or shelter, but not on the basis that the defendant meets the criteria for a Murphy conservatorship.

4. *The Conservator Did Not Have a Mandatory Duty to File a Petition Under the LPS Act Based on the Court's Determination That Karriker Appears Gravely Disabled*

 Karriker contends that the court correctly interpreted Penal Code section 1370 to authorize the court to order the Conservator to file a petition for a Murphy conservatorship, i.e., a conservatorship pursuant to section 5008, subdivision (h)(1)(B), if the court finds that he appears gravely disabled. When an incompetent defendant has been returned to court and "it appears to the court that the defendant is gravely disabled . . . the court shall order the conservatorship investigator . . . to initiate conservatorship proceedings." (Pen. Code, § 1370, subd. (c)(2).) As she did in the trial court, the Conservator argues that this section authorizes the court only to refer the matter to her office for investigation, which is the initiation of conservatorship proceedings, and does not authorize the court to order her to file a petition to impose a conservatorship. She contends that the determination of whether Karriker is gravely disabled as a result of a mental disorder and amenable to treatment under the Act, justifying the filing of a petition under the LPS Act, is vested solely in her discretion. We agree.

 Although Karriker may be correct that "[i]n ordinary statutory usage a proceeding is commenced by the filing of a petition or complaint" (*People v. Marchman* (2006) 145 Cal.App.4th 79, 88 [51 Cal.Rptr.3d 369]), the phrase "initiate proceedings" as used in Penal Code section 1370 , subdivision (c)(2) refers not to filing the petition but to conducting the investigation that is required before a petition may be filed under chapter 3 of the Act. As the court explained in *People v. Marchman, supra*, 145 Cal.App.4th at page 88, "To say the proceeding is to be conducted in accordance with a certain provision does not, on its face, address the prerequisites for the proceeding. Prerequisites take effect before the proceeding is conducted at all."

 Chapter 3 of the LPS Act provides for a conservatorship investigation and requires the Conservator to exercise her discretion to determine, based on the results of the investigation, whether a petition should be filed. (§ 5352.) Section 5352.5, which is entitled "Initiation of proceedings," provides that "Conservatorship proceedings may be initiated for any person committed to a state hospital . . . pursuant to Section 1026 or 1370 of the Penal Code . . . upon recommendation of the medical director of the state hospital . . . to the conservatorship investigator." When such a recommendation has been made, the Conservator investigates and exercises her discretion to determine whether a petition should be filed. (§ 5352 ["If the officer providing conservatorship investigation concurs with the recommendation, he shall petition the superior court . . . to establish conservatorship"].) Thus, as used in the LPS Act, proceedings are initiated when an authorized person

recommends a conservatorship and the conservatorship investigator conducts an investigation to determine whether an LPS conservatorship is justified. The conservatorship investigator, here the Conservator, "must then concur in the recommendation. *Only the investigating officer can petition the court to appoint a conservator.*" (2 Cal. Conservatorships & Guardianships, *supra*, § 15.3 at p. 893, italics added; § 15.53 at p. 952.)

We see no reason to distinguish between the "initiation" of conservatorship proceedings as that term is used in the LPS Act itself and the initiation of proceedings under the Act to which reference is made in Penal Code section 1370. The provisions in both codes cross-reference each other and were obviously intended to be applied in a consistent manner. Under section 5352.5, proceedings are initiated upon the recommendation of the hospital's medical director. Under Penal Code section 1370, proceedings are initiated upon the order of the trial court. As the Continuing Education of the Bar manual on California conservatorships points out, "[w]ithout making a recommendation, the court also may *order a conservatorship evaluation* under" Penal Code section 1370 and under certain other provisions. (2 Cal. Conservatorships & Guardianships, *supra*, § 15.34 at p. 934, italics added.) In either event the process begins with the Conservator's conducting her own investigation and determining whether it is appropriate to petition the court for the imposition of a conservatorship under the LPS Act.[11]

■ There is no merit to Karriker's argument that whether a defendant is gravely disabled for purposes of a Murphy conservatorship "involves a pure

---

[11] Moreover, as the Conservator points out, Penal Code section 1370.01, subdivision (c)(2), relating to incompetent misdemeanor defendants, uses the identical language that "the court shall order the conservatorship investigator . . . to initiate conservatorship proceedings for the defendant," but this authorization applies when the defendant appears gravely disabled because he or she is unable to care for himself or herself as a result of a mental disorder. (See fn. 10, *ante*.) There is absolutely no reason to believe that the court was given the authority under this section to order the conservatorship investigator to file a petition for a standard LPS conservatorship, and we must assume that the phrase "initiate conservatorship proceedings" has the same meaning in Penal Code section 1370.01 as in Penal Code section 1370.

Karriker bases his contrary interpretation on an early draft of the 1974 legislation amending Penal Code section 1370, as part of the same bill that added the definition of a Murphy conservatorship to the Welfare and Institutions Code. The original draft authorized the court to "order the defendant referred to" the local mental health director "to determine whether the provisions of the [LPS Act] are applicable," except in the case of a Murphy conservatorship, in which case "the court shall order the conservatorship investigator . . . to initiate conservatorship proceedings for such defendant." (Assem. Bill No. 1529 (1973–1974 Reg. Sess.) as introduced Apr. 24, 1973.) Karriker argues that this early version of the bill demonstrates that the Legislature intended the initiation of proceedings to be something other than a referral. However, later versions of the bill eliminated this distinction. We have been cited to no legislative materials indicating the reason for the deletion, nor to any materials suggesting that the "initiation" of proceedings was intended to have a different meaning in Penal Code section 1370 than in the relevant provisions of the Welfare and Institutions Code and in Penal Code section 1370.01.

question of criminal law and procedure." While a court may be able to determine conclusively whether a defendant meets some of the statutory requirements of section 5008, subdivision (h)(1)(B)—namely, whether the individual has been found mentally incompetent to stand trial and has been charged with certain felonies by an indictment or information that has not been dismissed[12]—questions of fact and expert judgment are central to the determination of whether the defendant is unable to understand the nature and purpose of the proceedings and to assist in his or her defense, much less whether such an inability results from a mental disorder. Nor can the court determine as a matter of law whether the defendant represents a substantial danger of physical harm to others by reason of a mental disease, defect or disorder, as required by *Hofferber, supra,* 28 Cal.3d 161. These facts must be pleaded and proven, and the findings must be based on the expert opinion of a mental health professional. (*Conservatorship of Torres* (1986) 180 Cal.App.3d 1159, 1163 [226 Cal.Rptr. 142] [expert testimony on issue of whether person is gravely disabled as a result of a mental disorder is relevant because "[a]lthough a juror might know whether a person was able to take care of his basic needs a juror cannot determine from common experience whether that inability results from a mental disorder or from some other reason"].)[13]

 Sections 5361 and 5362, also within chapter 3, further support this conclusion. Under these provisions the decision to petition for reappointment after the initial one-year period is vested in the discretion of the appointed conservator. In the case of a private conservator who fails to file a petition, the discretion to petition for reappointment is vested in the conservatorship investigator. (§§ 5361–5362; see also *In re Conservatorship of Martha P., supra,* 117 Cal.App.4th at p. 868 ["Under the LPS Act statutory scheme, it is a public official that has the duty to investigate the need for reestablishment of a conservatorship which may lead to continued commitment under the Act and who has the sole discretion to file a petition in light of that investigation"].) If the Conservator chooses not to file a petition to extend the conservatorship, the court must terminate the conservatorship. (§§ 5361–5362.) The LPS Act does not give the court authority to extend a conservatorship over a criminal defendant who remains incompetent to stand trial. Indeed, in *Conservatorship of Martha P., supra,* 117 Cal.App.4th 857, the court noted that the Conservator's dismissal of a petition to reestablish an

---

[12] Ironically, we note that Karriker does not meet even these requirements of section 5008, subdivision (h)(1)(B). Karriker has been charged only by a criminal complaint; there is no indictment and an information has not yet been filed following a determination that there is probable cause to believe that he committed the charged felony. (See Pen. Code, § 872.)

[13] A petition to reappoint a conservator must "include the opinion of two physicians or licensed psychologists who have a doctoral degree in psychology and at least five years of postgraduate experience in the diagnosis and treatment of emotional and mental disorders that the conservatee is still gravely disabled as a result of mental disorder or impairment by chronic alcoholism." (§ 5361.)

LPS conservatorship terminated the court's jurisdiction over the matter. (*Id.* at pp. 871–872.) "[W]hen the public conservator tendered or filed the voluntary dismissal of the subject reestablishment petition, that petition was effectively withdrawn, leaving no petition to reestablish Martha's conservatorship that had statutorily terminated at the end of one year. [Citations.] At that time, the court was without jurisdiction to take any action other than to 'issue a decree terminating conservatorship.' " (*Id.* at p. 872.)

There are many reasons for which the Conservator should not be compelled to file a petition requesting the imposition of an LPS conservatorship that the Conservator does not believe is justified. In *Kaplan, supra,* 216 Cal.App.3d 1354, 1359–1361, the court held that a husband could not file a conservatorship petition for his wife under the LPS Act because that power lies exclusively with the county officer designated in the Act, in that case the pubic guardian. The court explained that this conclusion is mandated by the plain language of the statutes and is "consistent with the underlying objectives the Legislature sought to achieve through LPS. The purpose of LPS has been stated in section 5001. The Legislature has there declared that its intent is, inter alia, to 'end the inappropriate, indefinite, and involuntary commitment of mentally disordered persons' [citation], and '[t]o safeguard individual rights through judicial review. . . .' [Citation.] A person subjected to conservatorship proceedings under LPS faces both involuntary commitment and the social stigma attaching to one found 'gravely disabled' as a result of a mental disorder. [Citation.] In order to protect the liberty and dignity of persons threatened with confinement in a mental health facility, the Legislature has determined that the safeguards attending Probate Code conservatorships are insufficient, and has required that such restraints may be imposed only after complying with LPS. A vital element of this protective framework is the vesting in a public official the duty to investigate the need for a conservatorship which may lead to commitment, and the discretion to file a petition in light of that investigation. [¶] To allow anyone who may initiate a Probate Code conservatorship to assume the role of 'prosecutor' in an LPS proceeding would run counter to these protections. The effect would be to eliminate a key element of a statutory structure designed to assure that abuses of the mental health system in the form of unwarranted commitments are avoided. Here, as in the case of a criminal defendant, it is appropriate that when the power of the state is invoked to deprive an individual of her freedom, the decision to commence judicial proceedings should be left to a public officer." (216 Cal.App.3d at p. 1360.)

While a judge presiding over criminal proceedings is in a very different position from a relative or other private party, as was involved in *Kaplan,* there are nonetheless good reasons for limiting the court's authority in the same manner. An LPS conservatorship is appropriate only if the individual's incompetency results from a mental disorder and no other

suitable alternative is available. (§ 5354.) "An LPS conservatorship is not appropriate unless a person who is gravely disabled . . . as a result of mental disorder . . . is in need of treatment but unwilling or incapable of accepting it voluntarily." (2 Cal. Conservatorships & Guardianships, *supra*, § 15.3 at p. 893.) The determination of these issues requires familiarity with the complexities of mental disease and the mental health system. While a public conservator must ultimately prove in judicial proceedings that an LPS conservatorship is justified before such a conservatorship may be imposed, the decision to seek such a remedy is itself significant, requires the exercise of sound discretion, and has been expressly delegated to the conservatorship investigator. By filing a petition with the court, the conservator—and the conservator's attorney—represent that the claims are warranted and that the allegations have evidentiary support. (See Code Civ. Proc., § 128.7, subd. (b).) Moreover, county counsel, who represents the Conservator in this action, or the district attorney is required to prosecute the petition when it has been filed. (§ 5114.) Ordering the Conservator to file a petition and attempt to prove its allegations when the Conservator in good conscience does not believe that the allegations are merited would thus create an irreconcilable ethical dilemma for more than one public official. Moreover, permitting the court to act both as prosecutor and potentially as the trier of fact would be inconsistent with the statutory scheme of protection that is built into the LPS Act.

Numerous analogies confirm the unavailability of mandate to compel the Conservator to file a petition which she does not feel to be appropriate. The discretion to file criminal charges is conferred upon a public prosecutor. A court has no authority to compel the prosecutor to file charges, regardless of the strength of the evidence. (*People v. Municipal Court* (1972) 27 Cal.App.3d 193, 207 [103 Cal.Rptr. 645].) Likewise, "[t]he decision of the Attorney General whether to participate in a lawsuit, where the State has no financial interest at stake nor possible liability, is a decision purely discretionary and, like decisions regarding the prosecution and conduct of criminal trials, exclusively within the province of the Attorney General's office and not subject to judicial coercion." (*State of California v. Superior Court* (1986) 184 Cal.App.3d 394, 398 [229 Cal.Rptr. 74]; see also *West v. State of California* (1986) 181 Cal.App.3d 753, 764–765 [227 Cal.Rptr. 16] [initiation of proceedings to revoke contractor's license upon receipt of consumer complaints is vested in the sound discretion of the Contractors' State License Board]; cf. *Heckler v. Chaney* (1985) 470 U.S. 821, 831 [84 L.Ed.2d 714, 105 S.Ct. 1649] ["This Court has recognized on several occasions over many years that an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion. [Citations.] This recognition of the existence of discretion is attributable in no small part to the general unsuitability for judicial review of

agency decisions to refuse enforcement."].) Although a court must be satisfied before relief is granted, the court may not control the discretion conferred upon another public official to determine whether to seek such relief.

As noted above, a conservatorship under the LPS Act is appropriate only when the conservatorship investigator considers that "no suitable alternatives are available." (§ 5354.) Here, the Conservator determined that the less intrusive remedy of conservatorship under the Probate Code would be more appropriate. The Conservator determined that Karriker's inability to care for himself is not a product of a mental disorder for which treatment is available in a state mental hospital, but a result of dementia. A Probate Code "conservatorship, not an LPS conservatorship . . . , addresses the special needs of a person with dementia." (2 Cal. Conservatorships & Guardianships, *supra*, § 15.6, p. 897; see Prob. Code, § 2356.5.) Karriker has indicated that he is amenable to voluntary treatment and he is not opposing a conservatorship. Both the public guardian and the Conservator have indicated that placement in a secured nursing facility would more appropriately address Karriker's needs. While the Conservator acknowledges that "[r]ight now there are no facilities available and we can't obviously put someone on a probate conservatorship where we can't meet their needs by finding a facility," she indicated that she would "continue to work with the Napa doctors about finding perhaps a skilled nursing facility under the Probate Code." She warned, however, that "it's very difficult to find a skilled nursing facility that will take someone with pending criminal charges and we can't start the Medi-Cal process. But we're not at all foreclosing the possibility that at some point down the road he might be able to be placed in a skilled nursing facility which is where we believe . . . people with dementia belong."

 The shortage of adequate skilled nursing facilities undoubtedly is a problem of significant proportions. (See Breaux & Hatch, Confronting Elder Abuse, Neglect, and Exploitation: The Need for Elder Justice Legislation (2003) 11 Elder L.J. 207, 267 ["there is a dearth of individuals available to care for our nation's elderly. This shortage is apparent not only in skilled nursing facilities, but in all long-term care residential settings and home health care programs"]; *Wayside Farms v. U. S. Dept. of Health & Human Serv.* (N.D.Ohio 1987) 663 F.Supp. 945, 952 [recognizing that "there is a nationwide shortage of skilled nursing home beds"]; *DeGregorio v. O'Bannon* (E.D.Pa. 1980) 500 F.Supp. 541, 550–551 ["in light of the undenied severe shortage of skilled nursing beds in the Commonwealth, and the infrequency with which enrolled homes elected to admit medicaid recipients, it is apparent that 70% participation was, in itself, inadequate to make nursing home care reasonably available to medicaid recipients"].) Nonetheless, the difficulty of

making an appropriate placement does not justify imposition of an inappropriate and unduly restrictive LPS conservatorship, nor does it justify abrogating the discretion that the LPS Act confers on public conservators to determine whether to seek such a conservatorship.

5. *The Conservator Did Not Abuse Her Discretion in Refusing to File the Petition in This Case.*

Defendant argued previously that even if the Conservator did not have a mandatory duty to file the petition, the court's order should be upheld because the Conservator abused her discretion in refusing to file the petition under the facts of this case. Accepting the premise that a public conservator might abuse his or her discretion in refusing to file a petition for a conservatorship under the LPS Act, the Conservator did not do so in this instance. Both the conservatorship investigation report and the special statutory treatment of dementia patients (§ 2356.5) support the Conservator's determination that an LPS conservatorship is not appropriate here.[14]

Penal Code section 1370 explicitly contemplates that some defendants charged with felonies will be released if they are not restored to competency within the allowable time period. As explained above, an LPS conservatorship is not a catchall for all incompetent defendants. Conservatorship under the LPS Act is appropriate only for those who are gravely disabled as a result of a mental disorder. (See *Kaplan, supra,* 216 Cal.App.3d at pp. 1359–1361; *People v. Skeirik, supra,* 229 Cal.App.3d at p. 456; cf. *Conservatorship of Benvenuto* (1986) 180 Cal.App.3d 1030, 1033–1034 [226 Cal.Rptr. 33] [if a conservatee is not presently gravely disabled, an LPS conservatorship cannot be extended because of a perceived likelihood of future disability]; *Conservatorship of Murphy* (1982) 134 Cal.App.3d 15, 18–19 [184 Cal.Rptr. 363] [same].) The Conservator did not abuse her discretion in failing to seek an LPS conservatorship for one who does not satisfy the statutory criteria.

---

[14] Furthermore, the court had before it no evidence indicating that defendant currently poses a danger to society. While the staff at the Napa State Hospital recommended an LPS conservatorship on the ground that Karriker is gravely disabled, at no time did anyone opine that he is dangerous. There is little in the record from which to glean the alleged facts of the crime of which he is accused. The court's statement of decision recites that "Mr. Karriker allegedly attacked his mother and threatened to kill her. The police were summoned and when they arrived, he charged them. It was necessary to subdue him by Taser." The source of this information is unclear, and its reliability has not been tested in a preliminary hearing.

## Disposition

The order directing the Conservator to file a conservatorship petition for Karriker under the LPS Act is reversed.

McGuiness, P. J., and Siggins, J., concurred.

On April 20, 2007, the opinion was modified to read as printed above.