Filed 11/24/14  In re Taitano CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re JORDAN TAITANO, <br><br>     on Habeas Corpus. | A141277 <br><br> (Contra Costa County <br> Super. Ct. No. 5-132337-7) |
| THE PEOPLE, <br><br>     Plaintiff and Appellant, <br><br> v. <br><br> CONTRA COSTA COUNTY HEALTH SERVICES PUBLIC CONSERVATOR PROGRAM, <br><br>     Defendant and Respondent; <br><br> JORDAN TAITANO, <br><br>     Real Party in Interest and <br>     Respondent. | (Contra Costa County <br> Super. Ct. No. 5-132560-4) |

Jordan Taitano (Defendant) was criminally charged with murder and other felony offenses.  He was found incompetent to stand trial, committed to a state hospital for treatment, and returned to court for further proceedings after the hospital declared him unlikely to regain mental competence in the foreseeable future.  (Pen. Code, §§ 1367-1370; 1370, subd. (b)(1).)  The court found Defendant remained incompetent and ordered the Health Services Public Conservator Program (Public Guardian), to initiate conservatorship proceedings under the Lanterman-Petris-Short Act (LPS or LPS Act).  (Welf. & Inst. Code, § 5000 et seq.; Pen. Code, § 1370, subd. (c)(2).)  The Public

1

Guardian concluded Defendant was not gravely disabled as required for an LPS conservatorship and declined to file a conservatorship petition. (Welf. & Inst. Code, § 5008, subd. (h)(1).)

The People, represented by the Contra Costa County District Attorney, filed a petition for writ of mandate directing the Public Guardian to petition the court for an LPS conservatorship. Defendant filed a petition for writ of habeas corpus, arguing his custody was unlawful absent an order establishing a conservatorship. The trial court denied the People's petition for writ of mandate and granted the Defendant's petition for writ of habeas corpus, concluding the Public Guardian's decision not to file a petition for conservatorship was an unreviewable exercise of discretion. We reverse, because that decision was reviewable for abuse of discretion, and the Public Guardian abused its discretion by failing to obtain a current evaluation by a qualified mental health professional addressing whether "by reason of a mental disease, defect, or disorder, [Defendant] represents a substantial danger of physical harm to others." (*Conservatorship of Hofferber* (1980) 28 Cal.3d 161, 176-177 (*Hofferber*).) We reject the People's broader claim that a "Murphy conservatorship" (Welf. & Inst., § 5008, subd. (h)(1)(B)) can be established without a petition being filed by the designated conservatorship investigator when the criminal court has issued an order to "initiate conservatorship proceedings." (Pen. Code, § 1370, subd. (c)(2).)

## I. Statutory Framework: Mentally Incompetent Criminal Defendants and the LPS Act

Both the due process clause of the Fourteenth Amendment to the United States Constitution and state law prohibit the state from trying or convicting a defendant who is mentally incompetent. (*People v. Ary* (2011) 51 Cal.4th 510, 517-518.) A defendant is incompetent "if, as a result of mental disorder or developmental disability, [he or she] is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner." (Pen. Code, § 1367.) When a defendant has been found incompetent, the court must suspend criminal proceedings and may commit the defendant to a state hospital for treatment designed to restore mental competency.

2

(*Id.*, § 1370, subds. (a)(1)(B) & (a)(1)(B)(i).) The state hospital or other treatment facility to which a defendant is committed must provide the court with written reports regarding the defendant's progress at specified intervals. (*Id.*, § 1370, subd. (b)(1).)

A commitment for treatment to restore mental competence is limited to three years or the maximum term of imprisonment for the most serious charged offense, whichever is shorter. (Pen. Code, § 1370, subd. (c)(1).) A defendant must be returned to court for further proceedings when he or she has not recovered competency within this period, or when the facility treating the defendant prepares a report indicating "there is no substantial likelihood that the defendant will regain mental competence in the foreseeable future." (*Id.*, § 1370, subds. (b)(1); see *id.*, § 1370, subds. (c)(1)-(2).)

Upon the defendant's return to court based on the expiration of the maximum confinement period or the lack of a substantial likelihood competence will be restored, the court may dismiss the charges and order the defendant released. (Pen. Code, § 1370, subds. (d), (e).) Alternatively, if "it appears to the court that the defendant is gravely disabled, as defined in subparagraph (B) of paragraph (1) of subdivision (h) of Section 5008 of the Welfare and Institutions Code, the court shall order the conservatorship investigator of the county of commitment of the defendant to initiate conservatorship proceedings for the defendant pursuant to Chapter 3 (commencing with Section 5350) of [the LPS Act]." (Pen. Code, § 1370, subd. (c)(2).)

The LPS Act is a comprehensive scheme for the involuntary detention, evaluation, and treatment of mentally ill individuals, or persons who, as a result of a mental disorder, are dangerous or gravely disabled. (*People v. Barrett* (2012) 54 Cal.4th 1081, 1108; *Conservatorship of John L.* (2010) 48 Cal.4th 131, 142.) It is "designed to address a variety of circumstances in which a member of the general population may need to be evaluated or treated for different lengths of time. ([Welf. & Inst. Code,] § 5150 [short-term emergency evaluation]; § 5250 [intensive 14-day treatment]; § 5300 [180-day commitment for the imminently dangerous]; § 5260 [extended commitment for the suicidal]; § 5350 [30-day temporary conservatorship or one year conservatorship for the gravely disabled].)" (*Cooley v. Superior Court* (2002) 29 Cal.4th 228, 253.)

Chapter 3 of the LPS Act, beginning with Welfare and Institutions Code section 5350, authorizes the creation of a renewable one-year conservatorship for persons who are gravely disabled as a result of a mental disorder. (*Id.*, §§ 5351, 5361.) Welfare and Institutions Code section 5008, subdivision (h)(1) sets forth two alternative definitions of "gravely disabled," the first of which could be met by members of the population at large (standard LPS conservatorships) and the second of which is relevant only to criminal defendants charged with certain types of felonies who have been found incompetent to stand trial (Murphy conservatorships): "(A) A condition in which a person, as a result of a mental health disorder, is unable to provide for his or her basic personal needs for food, clothing, or shelter. [¶] (B) A condition in which a person, has been found mentally incompetent under Section 1370 of the Penal Code and all of the following facts exist: [¶] (i) The indictment or information pending against the person at the time of commitment charges a felony involving death, great bodily harm, or a serious threat to the physical well-being of another person. [¶] (ii) The indictment or information has not been dismissed. [¶] (iii) As a result of a mental health disorder, the person is unable to understand the nature and purpose of the proceedings taken against him or her and to assist counsel in the conduct of his or her defense in a rational manner."[1]

Originally, the LPS Act did not contain any specific provisions allowing a long-term commitment of mentally incompetent criminal defendants. (*In re Polk* (1999) 71 Cal.App.4th 1230, 1236-1237 (*Polk*).) Such defendants were committed to a state hospital or other treatment facility until they regained competence, a practice that could effectively result in a lifetime sentence regardless of the crime charged and without a determination of guilt. (*People v. Skeirik* (1991) 229 Cal.App.3d 444, 456-457, fn. 13 (*Skeirik*).) That practice was halted by the California Supreme Court's decision in *In re Davis* (1973) 8 Cal.3d 798, 801 (*Davis*), which applied the rule of *Jackson v. Indiana* (1972) 406 U.S. 715 and held "no person charged with a criminal offense and committed

---

[1] Welfare and Institutions Code section 5008 has been amended since the relevant proceedings in this case; the amendments, however, are not material to our analysis and we quote the most recent version of the statute.

to a state hospital solely on account of his incapacity to proceed to trial may be so confined more than a reasonable period of time necessary to determine whether there is a substantial likelihood that he will recover that capacity in the foreseeable future." (*Davis*, at p. 801.) When there is no reasonable likelihood competence will be restored, "the court should either order [the defendant] released from confinement or initiate appropriate alternative commitment proceedings under the [LPS Act]." (*Id*. at p. 807.)

In response to *Davis*, the Legislature enacted Assembly Bill No. 1529 in 1974, which "amended both the procedure for the commitment of mentally incompetent criminal defendants in the Penal Code and the scope of long-term commitments under the LPS Act in the Welfare and Institutions Code." (*Polk*, *supra*, 71 Cal.App.4th at p. 1237.) The amendment rewrote Penal Code section 1370 to establish the current procedure a criminal court must follow after a defendant has been found incompetent, including the suspension of criminal proceedings, the preparation of progress reports at specified intervals, the requirement that the defendant be returned to court if a report indicates there is no substantial likelihood competence will be regained in the foreseeable future, the establishment of a three-year limit on the commitment period, and the authorization of conservatorship proceedings when the defendant is returned to court. (*Polk,* at p. 1237.) The bill also created the so-called Murphy conservatorship, named after the legislator who sponsored the bill, by amending the definition of "gravely disabled" in the LPS Act to include persons who have been found mentally incompetent and are charged with a felony involving death, great bodily harm or a serious threat to the physical well-being of another. (*Id.* at pp. 1236-1237; Welf. & Inst. Code, § 5008, subd. (h)(1)(B).)

In 1980, the California Supreme Court added an additional element to the Murphy conservatorship: that "by reason of a mental disease, defect, or disorder, the person represents a substantial danger of physical harm to others." (*Hofferber*, *supra*, 28 Cal.3d at pp. 176-177.) The court explained the equal protection clause of the Fourteenth Amendment to the United States Constitution prohibits the state from subjecting a person, solely because of pending criminal charges, to commitment standards more lenient or release standards more stringent than those applicable to persons not charged

5

with a criminal offense.  (*Id*. at p. 167.)  But the state's "compelling interests in public safety and in humane treatment of the mentally disturbed" (*id.* at p. 171) justified the "separate treatment of permanently incompetent criminal defendants formally charged with violent felonies" (*id*. at p. 173).  The court concluded "under a separate statutory scheme the state may confine incompetent criminal defendants, *on grounds that they remain violently dangerous*, when a magistrate or grand jury has found probable cause to believe that they have committed violent felonies."  (*Id*. at p. 174.)

Taken together, these changes were designed to "address the difficult problem of integrating and resolving the conflicting concerns of protecting society from dangerous individuals who are not subject to criminal prosecution, preserving a libertarian policy regarding the indefinite commitment of mentally incompetent individuals who have yet to be convicted of criminal conduct, and safeguarding the freedom of incompetent criminal defendants who present no threat to the public."  (*Skeirik*, *supra*, 229 Cal.App.3d at p. 456.)  A Murphy conservatorship is designed to protect the public but "is appropriate only for those who are gravely disabled as a result of a mental disorder."  (*People v. Karriker* (2007) 149 Cal.App.4th 763, 788 (*Karriker*).)  It is "not a catchall for all incompetent defendants."  (*Ibid*.)

## II.  Factual and Procedural History

On November 13, 2009, the Contra County District Attorney filed an information charging Defendant with murder, robbery, carjacking, attempted kidnapping, first degree burglary, and two counts of reckless evasion of a peace officer resulting in great bodily injury.  (Pen. Code, §§ 187, 211, 212.5 subd. (c), 215, 207 subd. (a), 664, 460, subd. (a); Veh. Code, § 2800.3.)  The charges were based on an incident in which Defendant kicked in the door of a motel room occupied by a married couple and fought with the husband while the wife jumped out the window.  Defendant then fled from the area in a truck taken from a man who initially agreed to give him a ride but jumped out when Defendant appeared ready to hit him.  Defendant led police officers on a high speed chase that ended when he collided with a car, killing one passenger and injuring the other two occupants.

6

Defense counsel declared a doubt as to Defendant's competency and he was examined by three evaluators:  Jennifer Kirkland, Ph.D. and Martin Blinder, M.D., who were appointed by the court, and Jessica Ferranti, M.D., who was hired by defense counsel.  All three concluded Defendant was incompetent to stand trial because, while he understood the legal process and the charges against him, he suffered from delusions making it impossible for him to assist his attorney in a rational defense.  Defendant insisted the police department, public defender, district attorney, and judge were part of a conspiracy against him, and that the car accident was part of a cover up because "there has been a target" on him since 2003.  He claimed an "Officer Hugles" had been stalking him and had caused the accident, though that claim had not been substantiated.

Ferranti diagnosed Defendant as suffering from delusional disorder, persecutory type, with amphetamine dependence in full sustained remission in a controlled setting. She considered him to present a moderate risk of danger to others given a number of factors, such as his gender, his antisocial traits, and his history of substance abuse, impulsive violence and unemployment.  Blinder diagnosed Defendant as suffering from polysubstance abuse, primarily methamphetamine, with delusional thought disorder secondary to the polysubstance abuse and antisocial personality disorder.  Kirkland believed Defendant's brain chemistry had been altered with methamphetamine use, which, combined with other stressors, "interacted to create the conditions conducive for a delusional system to develop.  I would also consider the possibility of an Axis II disturbance that predisposes him to externalize blame and feel some entitlement [and] encourages some of the paranoid and grandiose claims posed."

A jury found Defendant competent to stand trial, but the trial court granted a motion for judgment notwithstanding the verdict, found him incompetent, and committed him to the Department of Mental Health for treatment.[2]  A May 21, 2013 report from

---

[2]  The record in this appeal, taken from the orders on the petitions for writ of mandate and habeas corpus, does not include the transcripts from Defendant's criminal case or the trial on his mental competence.  At the hearing on the petitions for writ of mandate and habeas corpus, the court described the result of the competency proceedings

7

Atascadero State Hospital (ASH) signed by an evaluator and forensic services director concluded "there [was] no substantial likelihood that [Defendant would] regain mental competency in the foreseeable future." It reiterated Defendant's diagnoses of delusional disorder, polysubstance dependence, and antisocial personality disorder. Defendant's treatment team at ASH had not observed evidence of severe psychiatric symptoms, but "despite compliance with different psychotropic medications, there have been no changes in his claims that there are conspiracies involved in the events leading to his arrest and various conspiracies against him within the judicial system." The report indicated Defendant's danger to himself or others was "low," noting he had "not been violent since he was admitted to [ASH]; however, he has demonstrated some violence in the community."

Based on the report from ASH, Defendant was returned to court for proceedings under Penal Code section 1370, subdivision (c)(1). The court found Defendant remained incompetent and ordered the Public Guardian, as the conservatorship investigator for the county, to initiate conservatorship proceedings under the LPS Act.

Matt Domnick, a deputy conservator with the Public Guardian's conservatorship program, prepared a report after reviewing Defendant's mental health records and the criminal court file and personally interviewing Defendant. He noted Defendant did not have a history of psychiatric illness but was currently taking medication that made him feel more calm. Defendant was oriented as to time, place and situation, and answered questions about his future in a way suggesting he could care for himself in the community, though he made paranoid and delusional statements about the events leading

---

as follows: "I don't know who testified for the People, but I understand it wasn't a mental health professional. We had a jury trial and the jury . . . found him to be competent based upon non-expert testimony. I understand how we got here. [¶] The only reason why that sort of train got diverted on . . . another track, a judge of this court said, I can't allow this procedure to go forward in that way. I have got four experts, all of whom say this person is incompetent and somebody from the jail or something . . . said he seems normal to me, and the jury verdict was what it was and [the judge] said, I can't let that go forward."

8

to the criminal charges. Domnick concluded Defendant was not "gravely disabled" under either of the two definitions set forth in Welfare and Institutions Code section 5008, subdivision (h)(1), as required for a standard LPS conservatorship or Murphy conservatorship: "There are factors that may result in [Defendant] engaging in criminal activity in the future, whether in prison or in the community; recidivism rates, criminal history, illegal substance usage and past history of violence. However, none of this appears to be related to mental health issues or illness."

Linda Arzio, a program supervisor of the Public Guardian, submitted a report stating her office would not be filing a petition for LPS conservatorship in Defendant's case. Citing Domnick's report, she noted Defendant had not been diagnosed with a major mental illness and had been recently seen by a "Dr. Turpin," who was unable to determine which diagnosis rendered Defendant mentally incompetent to stand trial—the delusional disorder or amphetamine induced psychotic disorder. Defendant had no history of being unable to provide for his basic needs as would be necessary to find him gravely disabled under Welfare and Institutions Code section 5008, subdivision (h)(1)(A), and was not a danger to others by reason of a mental disorder as would be necessary to find him gravely disabled under subdivision (h)(1)(B). "[W]hile the [D]efendant poses a danger to others in the community, it is not possible to attribute it to a mental illness or his diagnosed disorder." Arzio also indicated the Public Guardian had a policy of filing petitions only for those individuals who suffered recurring episodes of a *serious* mental disorder, defined as one "severe in degree and persistent in duration, which may cause behavioral functioning which interferes substantially with the primary activities of daily living, and which may result in an inability to maintain stable adjustment and independent functions without treatment, support, and rehabilitation for a long or indefinite period of time." (*Id.*, § 5600.3, subds. (b)(1)-(2).) According to Arzio, public funds would not be available to pay for the placement of a conservatee whose diagnosis was methamphetamine-induced disorder, and Defendant's delusional disorder was coexistent with a diagnosis of methamphetamine-induced psychosis, which related to

9

a methamphetamine binge leading to the criminal charges. (See *id*., § 5600.3, subd. (b)(3)(A).)

The People petitioned for writ of mandate under Code of Civil Procedure section 1085, asking the superior court to hold a hearing to review the Public Guardian's decision not to file a conservatorship petition. Defendant filed a petition for writ of habeas corpus seeking release. Following a combined hearing on the writ petitions, the court issued an order granting Defendant's petition for writ of habeas corpus and denying the People's petition for writ of mandate.

Citing *Karriker*, *supra*, 149 Cal.App.4th 763, the superior court concluded the Public Guardian was the entity charged with filing a Murphy conservatorship petition and the decision not to file was a nonreviewable exercise of discretion comparable to a district attorney's discretion to decide whether a criminal matter should be prosecuted. (See *id*. pp. 782-788.) The court expressed concern the two employees of the Public Guardian who made the decision in this case (Domnick and Arzio) were not licensed mental health professionals. It also noted defendant had a history of confronting and attacking the police, meaning his delusions, which centered around law enforcement and the court system, would appear to create a risk to that segment of the community. Although interpreting *Karriker* to preclude review of the Public Guardian's decision, the court stated "the factual allegations by the District Attorney and the facts disclosed by the pertinent court files make a very plausible case for the proposition that the Public Guardian has abused his discretion in declining to bring conservatorship proceedings as to [Defendant]."

The People appeal this order. (*California Bldg. Industry Assn. v. Governing Bd.* (1988) 206 Cal.App.3d 212, 222, fn. 9 [order denying petition for writ of mandate appealable under Code. Civ. Proc., § 904.1, subd. (a)]; Pen. Code, § 1506 [order granting petition for writ of habeas corpus appealable].)

### III. Discussion

A. *Failure to Hold a Hearing on a Murphy Conservatorship*

The People argue the trial court should have granted the petition for writ of mandate and ordered a hearing to determine whether Defendant met the criteria for a Murphy conservatorship. They claim a Murphy conservatorship does not require a petition from the conservatorship investigator, as does a standard LPS conservatorship for a person who is gravely disabled as defined in Welfare and Institutions Code section 5008, subdivision (h)(1)(A) (i.e., persons unable to provide for basic personal needs as a result of a mental disorder).[3] The Public Guardian responds that a conservatorship petition is required and while a court acting under Penal Code section 1370, subdivision (c)(2), has the authority to refer a case to the conservatorship investigator, the investigator has the sole discretion to determine whether a petition should be filed. We agree with the Public Guardian on this point.

Under the LPS Act, each county is required to designate an agency to act as its conservatorship investigator. (Welf. & Inst. Code, § 5351.) The investigator's duties include the preparation of a comprehensive report regarding a proposed conservatee's circumstances, including a discussion of alternatives to conservatorship if conservatorship is not recommended. (*Id.*, § 5354.) In the context of a standard LPS conservatorship, a recommendation for conservatorship may be made to the conservatorship investigator by a "professional person in charge of an agency providing comprehensive evaluation or a facility providing intensive treatment" to the person, whether inpatient or outpatient. (*Id.*, § 5352.) "If the officer providing conservatorship investigation concurs with the [treatment provider's] recommendation, he shall petition the superior court . . . to establish a conservatorship." (*Ibid.*) Only the investigating agency can petition the court to appoint a conservator in a standard LPS conservatorship.

---

[3] Although the Public Guardian considered the issue as part of its evaluation of Defendant, no party suggests Defendant is unable to provide for his basic needs so as to meet the definition of gravely disabled under Welfare and Institutions Code section 5008, subdivision (h)(1)(A).

11

(*Conservatorship of John L.*, *supra*, 48 Cal.4th at p. 144; *Conservatorship of Martha P.* (2004) 117 Cal.App.4th 857, 868; *Kaplan v. Superior Court* (1989) 216 Cal.App.3d 1354, 1359-1361.)

Penal Code section 1370, subdivision (c)(2) sets forth the procedure for initiating a Murphy conservatorship when a criminal defendant accused of "a felony involving death, great bodily harm, or a serious threat to the physical well-being of another person" remains mentally incompetent to stand trial after he or she is returned to court and is due to be released. When it appears to the trial court a defendant meets the criteria for a Murphy conservatorship, the court "shall order the conservatorship investigator of the county of commitment of the defendant to initiate [LPS] conservatorship." (*Ibid*.) The People construe this language to mean that once the trial court issues such an order, a hearing on the merits of a Murphy conservatorship petition is required whether or not the conservatorship investigator concurs and files a conservatorship petition. They note Penal Code section 1370 does not explicitly refer to a conservatorship petition.

Two courts of appeal have considered similar claims. In *Karriker*, *supra*, 149 Cal.App.3d at pages 770-772, a public conservator appealed a superior court order directing it to file a petition to establish an LPS conservatorship over a criminal defendant. The Court of Appeal interpreted the phrase "initiate proceedings" as used in Penal Code section 1370, subdivision (c)(2) to refer "not to filing the petition but to conducting the investigation that is required before a petition may be filed." (*Karriker,* at p. 782.) Thus, although the criminal court could refer the matter to the public conservator for investigation, it could not order the conservator to file a petition. (*Ibid.*) Implicit in the *Karriker* court's discussion is the assumption a petition by the conservatorship investigator is a prerequisite to an order establishing a Murphy conservatorship.

In *County of Los Angeles v. Superior Court* (2013) 222 Cal.App.4th 434 (*Kennebrew*), the court rejected a public guardian's challenge to a superior court order requiring it to file a petition to establish a Murphy conservatorship over a defendant who suffered from dementia and remained mentally incompetent to stand trial on murder and other charges. (*Id*. at pp. 438-441.) The Court of Appeal concluded the superior court

12

order, which operated as a writ of mandate (*id*. at p. 444), was appropriate because the public guardian had abused its discretion in concluding dementia did not qualify as a mental disorder under the LPS Act (*id*. at pp. 447-451). The court explained: "We believe that under [Penal Code section 1370, subdivision (c)(2)] the initiation of conservatorship proceedings refers to the petitioning for conservatorship under the LPS Act, enabling the court to appoint counsel for the defendant and to commence the investigation and investigator's report that is mandated by [Welfare and Institutions Code] section 5354. Then, as provided by [Welfare and Institutions Code] section 5354, upon consideration of the report and any other evidence presented to it, the court may render judgment—either following or diverging from the conservatorship investigator's recommendation." (*Id*. at p. 454.) Effectively, this means that once a court has ordered the conservatorship investigator to initiate proceedings under Penal Code section 1370, subdivision (c)(2), a petition must be filed or the court must otherwise determine whether a Murphy conservatorship should be established.

We agree with the *Karriker* court the phrase "initiate conservatorship proceedings" as used in Penal Code section 1370, subdivision (c)(2) is more reasonably construed to mean the criminal court may refer the case to the conservatorship investigator for investigation, at which point the conservatorship investigator decides whether a petition under the LPS Act is appropriate. We therefore reject the People's argument that an order by the criminal court referring a case to the conservatorship investigator under Penal Code section 1370, subdivision (c)(2) requires the conservatorship investigator to file a petition or requires a hearing on the merits of a Murphy conservatorship when the investigator declines to file a petition. We reach this conclusion for a number of reasons.

First, Penal Code section 1370, subdivision (c)(2) states the court shall order the investigator "to initiate conservatorship proceedings for the defendant pursuant to Chapter 3 (commencing with Section 5350) of Part 1 of Division 5 of the Welfare and Institutions Code." Chapter 3 contains a number of provisions related to the establishment of a conservatorship under the LPS Act and the related duties of the

13

conservatorship investigator. If the Legislature had intended the superior court's order under Penal Code section 1370, subdivision (c)(2) to require the filing of a conservatorship petition or obviate the need for such a petition, we think it would have said so directly. That it referred to the Chapter pertaining to LPS conservatorships as a whole indicates it intended the conservatorship investigator to play the same role in a Murphy conservatorship as he or she would play in a standard LPS conservatorship, though proceedings would be triggered by an order of the criminal court rather than the recommendation of a treatment provider.

Second, Welfare and Institutions Code section 5114, which applies to the entire LPS Act, provides: "At any judicial proceeding under the provisions of this division, allegations that the person is a danger to others, or to himself, or gravely disabled as a result of mental disorder or impairment by chronic alcoholism, shall be presented by the district attorney for the county, unless the board of supervisors, by ordinance or resolution, delegates such duty to the county counsel." In placing the authority to file an LPS conservatorship petition with the public legal office assigned to represent the conservatorship investigator, this statute necessarily contemplates the decision to proceed will be made by the conservatorship investigator. " 'A vital element of [the] protective framework [of the LPS Act] is the vesting in a public official the duty to investigate the need for a conservatorship which may lead to commitment, and the discretion to file a petition in light of that investigation.' " (*Karriker*, *supra*, 149 Cal.App.4th at p. 785, citing *Kaplan v. Superior Court, supra,* 216 Cal.App.3d at p. 1360 [holding private parties do not have authority to file LPS petition].) "While a judge presiding over criminal proceedings is in a very different position from a relative or other private party, as was involved in *Kaplan*, there are nonetheless good reasons for limiting the court's authority in the same manner. An LPS conservatorship is appropriate only if the individual's incompetency results from a mental disorder and no other suitable alternative is available. ([Welf. & Inst.] Code, § 5354.) 'An LPS conservatorship is not appropriate unless a person who is gravely disabled . . . as a result of a mental disorder . . . is in need of treatment but unwilling or incapable of accepting it voluntarily.' [Citation.] The

14

determination of these issues requires familiarity with the complexities of mental disease and the mental health system.  While a public conservator must ultimately prove in judicial proceedings that an LPS conservatorship is justified . . . the decision to seek such a remedy is itself significant, requires the exercise of sound discretion, and has been expressly delegated to the conservatorship investigator." (*Karriker*, at pp. 785-786.)

Third, language similar to that in Penal Code section 1370, subdivision (c)(2) is contained in Welfare and Institutions Code section 5352.5, which is entitled "Initiation of Conservatorship Proceedings" and which provides, "Conservatorship proceedings may be initiated for any person committed to a state hospital . . . pursuant to Section 1026 or 1370 of the Penal Code or transferred pursuant to Section 4011.6 of the Penal Code upon recommendation of the medical director of the state hospital. . . . The initiation of conservatorship proceedings or the existence of a conservatorship shall not affect any pending criminal proceedings."  Under this provision, the medical director of the state hospital may make a recommendation but does not have the authority to directly petition for a conservatorship (see Welf. & Inst. Code, § 5114); hence, the initiation of conservatorship proceedings in this context must mean the referral to the conservatorship investigator to consider filing a petition.  "It is a general rule of statutory construction to construe words or phrases in one statute in the same sense as they are used in a closely related statute pertaining to the same subject.  [Citations.]" (*California Society of Anesthesiologists v. Brown* (2012) 204 Cal.App.4th 390, 403.)

Fourth, Penal Code section 1370.01, subdivision (c)(2), relating to incompetent misdemeanor defendants who are returned to court, uses the identical language that "the court shall order the conservatorship investigator . . . to initiate conservatorship proceedings for the defendant," although this authorization applies only when a defendant appears gravely disabled by virtue of being unable to care for himself or herself as a result of a mental disorder and not on the basis of factors supporting a Murphy conservatorship.  "There is absolutely no reason to believe that the court was given the authority under this section to order the conservatorship investigator to file a petition for a standard LPS conservatorship, and we must assume that the phrase 'initiate

15

conservatorship proceedings' has the same meaning in Penal Code section 1370.01 as in Penal Code section 1370." (*Karriker*, *supra*, 149 Cal.App.4th at p. 783, fn. 11.)

Fifth, a conservatorship under the LPS Act lasts one year, and the decision to petition for reappointment is vested in the appointed conservator or the conservatorship investigator if a private conservator fails to file a petition. (*Karriker*, *supra*, 149 Cal.App.4th at p. 784.) It would make little sense for the Legislature to have deprived the conservatorship investigator of the discretion to initiate Murphy conservatorship proceedings, only to entrust the same entity with the discretion to decide whether to seek a recommitment a year later.

Finally, we agree with *Karriker* that "[o]rdering the Conservator to file a petition and attempt to prove its allegations when the Conservator in good conscience does not believe that the allegations are merited would . . . create an irreconcilable ethical dilemma for more than one public official. Moreover, permitting the court to act both as prosecutor and potentially as the trier of fact would be inconsistent with the statutory scheme of protection that is built into the LPS Act." (*Karriker*, *supra*, 149 Cal.App.4th at p. 786.)

Based on these considerations, we follow *Karriker* and conclude a Murphy conservatorship can only be ordered on a petition filed by the conservatorship investigator (here, the Public Guardian), represented by the district attorney or county counsel (here, county counsel). In so concluding, we do not mean to suggest that the statutes at issue are a model of clarity. Certainly, the task of interpreting the provisions before us is complicated by the fact the Murphy conservatorship was engrafted onto an existing civil commitment scheme that was not originally intended to deal with the specific problem of mentally incompetent criminal defendants due to be released with serious felony charges still pending. But the Legislature has chosen to deal with mentally incompetent defendants through the LPS Act, we cannot disregard the role of the conservatorship investigator in determining whether to file a petition. Should the Legislature wish to limit or eliminate the role of the conservatorship investigator in the case of Murphy conservatorships, it could potentially devise a different scheme so long as

16

the process is consistent with the constitutional requirements for civilly committing individuals who are dangerous due to their mental illness. (See *Hofferber*, *supra*, 28 Cal.3d at pp. 176-177.) Unless and until the Legislature does so, the proper vehicle for a Murphy conservatorship is a petition filed by the conservatorship investigator.

At oral argument, the People suggested that when the Public Guardian elects not to file a petition seeking a Murphy conservatorship, the district attorney in the underlying criminal case, as a representative of the People, should nonetheless be allowed to present evidence and advocate in favor of a conservatorship. We do not agree. The LPS Act places the discretion to file an LPS petition with the conservatorship investigator, in this case the Public Guardian represented by county counsel. Penal Code section 1370, subdivision (c)(2) allows the criminal court to refer a case to the appropriate agency for LPS conservatorship proceedings, but does not authorize the prosecutor of the criminal case to directly seek such a conservatorship. This procedure reflects a balancing of the state's concern with public safety and the rights of an incompetent criminal defendant who has yet to be convicted of a crime. (See *Skeirik*, *supra*, 229 Cal.App.3d at p. 456.) A Murphy conservatorship is part of a civil commitment scheme; it is not a continuation of the criminal proceedings. (See *Sorenson v. Superior Court* (2013) 219 Cal.App.4th 409, 432 [LPS commitment is not punishment in design or purpose].)

B. *Abuse of Discretion*

The People alternatively argue that if a Murphy conservatorship requires a petition by the Public Guardian, the Public Guardian abused its discretion in this case by electing not to file a petition. This requires us to examine the extent to which a trial court may review a conservatorship investigator's decision not to file a Murphy conservatorship petition following a referral by a criminal court under Penal Code section 1370, subdivision (c)(2).

"A writ of mandate may be issued by any court to any inferior tribunal, corporation, board, or person, to compel the performance of an act which the law specially enjoins, as a duty resulting from an office, trust, or station . . . ." (Code Civ. Proc., § 1085, subd. (a).) To obtain writ relief, the petitioner must show " '(1) a clear,

17

present, ministerial duty on the part of the respondent and (2) a correlative clear, present, and beneficial right in the petitioner to the performance of that duty.' [Citations.]" (*Karriker*, *supra*, 149 Cal.App.4th at p. 774.) As we have already explained, an order by a criminal court under Penal Code section 1370, subdivision (c)(2) directing a conservatorship investigator to initiate Murphy conservatorship proceedings does not impose a mandatory duty on the investigator to file a petition. (*Id*. at p. 782.)

This does not end our inquiry. " 'Although mandate will not lie to control a public agency's discretion, that is to say, force the exercise of discretion in a particular manner, it will lie to correct abuses of discretion . . . .' " (*Klajic v. Castaic Lake Water Agency* (2001) 90 Cal.App.4th 987, 995.) An abuse will be found when the agency's action was "arbitrary, capricious, or entirely lacking in evidentiary support, contrary to established public policy, unlawful, procedurally unfair, or [when] the agency failed to follow the procedure and give the notices the law requires." (*Ibid*.) "In determining whether an agency has abused its discretion, the court may not substitute its judgment for that of the agency, and if reasonable minds may disagree as to the wisdom of the agency's action, its determination must be upheld. [Citation.]' " On review, we apply a substantial evidence test to the trial court's factual findings but independently review the interpretation of statutes and other issues of law. (*Id*. at pp. 995-996.)

In *Karriker*, the Court of Appeal reversed a trial court order that functioned as a writ of mandate directing a conservatorship investigator to file a petition for a Murphy conservatorship. (*Karriker*, *supra*, 149 Cal.App.4th at pp. 772, 789.) The court concluded the investigator had no mandatory duty to file a petition based on the criminal court's determination a defendant appears gravely disabled, and had not abused its discretion in declining to file a petition under the facts of the case. (*Id*. at pp. 782, 788-789.) The superior court here interpreted *Karriker* to mean the Public Guardian's decision not to file a petition could not be reviewed in a mandate proceeding. In so doing, it gave *Karriker* too broad of a reading. While the superior court could not order the Public Guardian to exercise its discretion in a particular manner, i.e., to file a

18

guardianship petition,[4] the holding in *Karriker* does not bar the court from reviewing the Public Guardian's decision for abuse of discretion and, if appropriate, ordering the Public Guardian to exercise its discretion in accordance with the law.

The superior court noted in its order denying the petition for writ of mandate that the Public Guardian's failure to obtain a contemporaneous report from a qualified mental health professional regarding Defendant's current dangerousness made "a very plausible case" for abuse of discretion. We share the trial court's concerns. Four elements are required to establish a Murphy conservatorship: (1) an information or indictment charges the defendant with a felony involving death, great bodily harm or threat to the physical well-being of another; (2) the indictment or information has not been dismissed; (3) the defendant is currently incompetent to understand the nature and purpose of the legal proceedings or to assist counsel in a rational manner; and (4) "by reason of a mental disease, defect, or disorder, the person represents a substantial danger of physical harm to others." (*Karriker*, *supra*, 149 Cal.App.4th at p. 776; Welf. & Inst. Code § 5008, subd. (h)(1)(B).) Defendant clearly met the first three elements, the critical issue being whether he had a mental disorder rendering him a substantial danger to others. Apparently, no qualified mental health professional rendered an opinion on this precise issue.

The two employees of the Public Guardian who reviewed this case and determined Defendant did not qualify for a Murphy conservatorship were neither psychologists nor psychiatrists, nor did they obtain an opinion from any such professional on the relationship between Defendant's mental disorder(s) and current dangerousness.[5] Domnick, the deputy conservator, reviewed Defendant's treatment records from ASH and

---

[4] We disagree with *Kennebrew*, *supra*, 222 Cal.App.4th at pages 444-446, to the extent it holds to the contrary.

[5] Arzio's report states defendant was examined at the jail by a Dr. Turpin, who was "unable to determine which of the two diagnoses renders [defendant] incompetent: the Delusional Disorder or the Amphetamine Induced Psychotic Disorder." Dr. Turpin's report is not in the record, nor does Arzio indicate whether the issue of current dangerousness was considered.

the local jail, and concluded Defendant was not a danger to self or others, though he might be at risk of future criminal behavior due to factors other than a mental disorder. Arzio, the program supervisor of the Public Guardian, believed Defendant did not suffer from a "serious" mental disorder under the LPS Act, and further concluded it was impossible to attribute his criminal behavior to mental illness.

Welfare and Institutions Code section 5354 requires the conservatorship investigator to provide the court with a comprehensive report containing "all relevant aspects of the person's medical, psychological, financial, family, vocational and social condition." In the context of a Murphy conservatorship, the most relevant aspect of a person's psychological condition is whether he or she is currently dangerous as a result of a mental disease, defect or disorder. (*Hofferber*, *supra*, 28 Cal.3d at p. 178.) The resolution of this issue requires the expert opinion of a qualified mental health professional. (*Karriker*, *supra*, 149 Cal.App.4th at p. 784 [finding on whether defendant represents substantial danger of physical harm to others by reason of mental disease, defect or disorder must be based on expert opinion of mental health professional]; see *Conservatorship of Torres* (1986) 180 Cal.App.3d 1159, 1163 [although laypersons might know whether a person is able to take care of his or her basic needs, they "cannot determine from common experience whether that inability results from a mental disorder or from some other reason"].)

Arzio's focus on whether Defendant's mental disorder was "serious" enough to qualify for LPS treatment seems to miss the boat, as no such limitation appears in the LPS Act. Indeed, while the term "mental disorder" is not defined, the practice under LPS has been to limit the term to conditions listed in the Diagnostic and Statistical Manual of Mental Disorders (DSM). (*Karriker*, *supra*, 149 Cal.App.4th at p. 775, fn. 4.) Defendant was diagnosed with a delusional disorder, polysubstance dependence, and antisocial personality disorder, all of which are DSM-IV diagnoses. Additionally, Arzio's concern about whether the county would receive funding for placing Defendant in its Murphy conservatorship program overlooks the fundamental reason for a Murphy conservatorship—protection of the public. (*Karriker*, *supra*, 149 Cal.App.4th at p. 778;

20

see Welf. & Inst. Code, § 5358, subds. (a)(1)(B), (c)(2) [placement of Murphy conservatee must achieve purposes of treatment and protection of the public].) In light of the pending charges against Defendant and his incompetence to stand trial, he should be placed in a Murphy conservatorship if he suffers from a mental disorder that renders him a substantial risk to the safety of others.

Given the importance of society's interest in ensuring dangerous individuals suffering from a mental disorder will receive treatment, we hold a conservatorship investigator abuses his or her discretion in declining to file a Murphy conservatorship petition for an otherwise eligible defendant without obtaining an opinion from a qualified mental health professional on the precise issue of whether that person currently presents a substantial danger to others due to a mental disease, defect or disorder. No such evaluation was apparently prepared in this case, and cursory references to a "low" or "moderate" risk of danger to others in the competency evaluations and reports cannot suffice when the evaluators were not asked to address the question in the proper context. The order granting Defendant's petition for writ of habeas corpus and denying the People's petition for writ of mandate must be reversed to enable the trial court to direct the Public Guardian to obtain a psychological/psychiatric evaluation addressing the specific elements of a Murphy conservatorship, and to hold a new hearing following the preparation of that report.[6]

Finally, we summarily reject the Public Guardian's contention Defendant does not qualify for a Murphy conservatorship because Welfare and Institutions Code section 5008, subdivision (h)(1)(B)(iii) defines grave disability to require a two-prong showing—the person "is unable to understand the nature and purpose of the proceedings taken against him or her *and* to assist counsel in the conduct of his or her defense in a rational

_____

[6] As far as the qualifications of the mental health professional, we note that when a conservator seeks reappointment after the expiration of the one year period for an LPS conservatorship, the petition for reappointment "must include the opinion of two physicians or licensed psychologists who have a doctoral degree in psychology and at least five years of postgraduate experience in the diagnosis and treatment of emotional and mental disorders." (Welf. & Inst. Code, § 5361.)

21

manner" (italics added)—and Defendant only met the second prong. The use of the conjunction "and" in section 5008, subdivision (h)(1)(B)(iii), contrasted to the use of "or" in the definition of mental incompetence contained in Penal Code section 1367, subdivision (a) ("A defendant is mentally incompetent for purposes of this chapter if, as a result of a mental disorder or developmental disability, the defendant is unable to understand the nature of the criminal proceedings *or* to assist counsel in the conduct of a defense in a rational manner") is clearly an oversight. There is no conceivable reason a different definition of competence would be used for a Murphy conservatorship, which is designed for incompetent criminal defendants. (See *People v. Skinner* (1985) 39 Cal.3d 765, 775 [inadvertent use of "and" where the purpose or intent of a statute requires "or" is a drafting error that may be rectified by judicial construction].)

## IV. Disposition

The order denying the People's petition for writ of mandate and granting Defendant's petition for writ of habeas corpus is reversed and the case is remanded for further proceedings consistent with the views expressed in this opinion.

_____
NEEDHAM, J.

We concur.

_____
JONES, P. J.

_____
SIMONS, J.

22