Filed 4/28/16  In re Donna P. CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re DONNA P., a Developmentally Disabled Person.<br><br>HARBOR DEVELOPMENTAL DISABILITIES FOUNDATION, etc.,<br><br>   Petitioner and Respondent,<br><br>      v.<br><br>JOSEPH P.,<br><br>   Objector and Appellant. | G050750<br><br>(Super. Ct. No. A189037)<br><br>O P I N I O N |

Appeal from an order of the Superior Court of Orange County, Gerald G. Johnston, Judge.  Affirmed in part and reversed in part.

Locke Lord, Jon L. Rewinski and Matthew B. Nazareth for Objector and Appellant.

No appearance for Respondent.

Suzanne Davidson, under appointment by Court of Appeal, for Donna P.

\*          \*          \*

Donna P.[1] is a 63-year-old, developmentally disabled person who has resided at Fairview Developmental Center (Fairview) for more than 25 years. Since 1997, the trial court has authorized Donna's Fairview residence based on a series of placements under the Lanterman Developmental Disabilities Services Act (Lanterman Act; Welf. & Inst. Code, § 4500 et seq.).[2] The Harbor Regional Center initiated each of these placements by petitioning for court approval, and Donna's conservator, Joseph P., supported the ongoing placement.

In an earlier writ proceeding, Joseph challenged a trial court order granting a habeas corpus petition the Orange County Public Defender (Public Defender) filed to obtain Donna's release from Fairview. We issued an alternative writ directing the trial court to vacate its order and enter a new order dismissing the habeas corpus petition because the Public Defender failed to establish it had standing to bring the petition on Donna's behalf. Our alterative writ also directed the trial court to schedule a hearing on a petition the Harbor Regional Center previously had filed seeking court approval of Donna's ongoing Fairview placement. We instructed the trial court to schedule and conduct the hearing consistent with our decision in *Michelle K. v. Superior Court* (2013) 221 Cal.App.4th 409 (*Michelle K.*).

In *Michelle K.*, we concluded a developmentally disabled person has a due process right to periodic judicial review of a state developmental center placement because a developmental center is the most restrictive placement available under the Lanterman Act and the placement constitutes a significant restraint on a person's

---

[1]     For privacy reasons, we abbreviate the last name of Donna and her family members, and will use only their first names. (See Welf. & Inst. Code, § 4502, subd. (b); *Conservatorship of Susan T.* (1994) 8 Cal.4th 1005, 1008, fn. 1.) No disrespect in intended.

[2]     All further statutory references are to the Welfare and Institutions Code unless otherwise stated.

2

fundamental liberty interests. We also concluded a developmentally disabled person's equal protection rights required periodic judicial review because other adults placed in similar protective custody under other statutory schemes have the right to periodic judicial review of their confinement.

As instructed, the trial court vacated its order granting the Public Defender's habeas corpus petition and entered a new order dismissing that petition, but the Harbor Regional Center requested to withdraw its petition for court approval of Donna's ongoing Fairview placement before the hearing. The Harbor Regional Center explained since it originally filed its petition over three years earlier it had determined a less restrictive placement could meet Donna's needs. The trial court allowed the Harbor Regional Center to withdraw its petition and rejected Joseph's contention *Michelle K.* required the court to review the placement despite the Harbor Regional Center's request. The trial court also ordered Donna discharged from Fairview and placed in a facility suitable to her needs. Joseph appealed.

We affirm the portion of the trial court's order refusing to review Donna's ongoing Fairview placement and allowing the Harbor Regional Center to withdraw its petition for court approval of that placement. *Michelle K.* required judicial review for the limited purpose of determining whether Donna's disabilities continued to justify the restraint on her personal liberty inherent in her ongoing developmental center placement. That review serves as a constitutional safeguard to ensure the statutory scheme authorizing the ongoing placement does not allow the Harbor Regional Center and Joseph to indefinitely confine Donna in Fairview without any independent review.

After the Harbor Regional Center withdrew its support for Donna's ongoing Fairview placement, however, judicial review was unnecessary because the Lanterman Act does not permit Donna to remain at Fairview without the Harbor Regional Center's approval. The Harbor Regional Center's decision to withdraw its placement petition transformed this matter from an independent review of the ongoing placement's

constitutionality into a dispute between Joseph and the Harbor Regional Center over the least restrictive placement capable of meeting Donna's needs.

It is well established the Lanterman Act's administrative fair hearing process provides the exclusive forum for resolving a dispute over whether a developmentally disabled person should remain in a development center or transition into a less restrictive community-based facility. Judicial review may be sought only after that administrative remedy is exhausted. *Michelle K.* did nothing to change that basic rule. The nature and purpose of the periodic judicial review *Michelle K.* requires to ensure the constitutionality of Donna's placement differs greatly from the dispute resolution hearing under the fair hearing process.

Joseph therefore must invoke the fair hearing process to challenge the Harbor Regional Center's decision to transfer Donna to a specific community-based facility, and he may obtain judicial review only after that process has run its course. To minimize the impact on Donna, *Michelle K.* and the Welfare and Institutions Code prohibit the Harbor Regional Center from transferring Donna to another facility until all issues concerning her placement are resolved and all services and supports she requires are in place at the new facility. We therefore reverse the portion of the trial court's order directing the Harbor Regional Center to discharge Donna from Fairview because the court did so without the Harbor Regional Center identifying a specific, less restrictive facility that could receive Donna and meet her needs.

I

FACTS AND PROCEDURAL HISTORY

Donna is a 63-year-old, developmentally disabled adult with an estimated IQ of 46. She has been diagnosed with moderate mental retardation, congenital hydrocephalus, hypocalcemia, ataxia, and ocular hypertension. Donna is able to communicate with yes or no answers and simple phrases, but her ability to comprehend

others is limited and her speech is difficult to understand for people who do not know her well. She is ambulatory and possesses both fine and gross motor skills, but requires 24-hour total care and supervision because she is unable to independently perform the activities of daily living.

Donna originally was admitted to Fairview in 1989, after the facility where she previously resided closed. Since 1997, she has remained at Fairview based on a series of placements under the Lanterman Act. Donna's only sibling, her brother Matthew, also is developmentally disabled and he too resides at Fairview. The trial court has annually reviewed the suitability of Donna's ongoing Fairview placement under *In re Hop* (1981) 29 Cal.3d 82 (*Hop*) and section 4825. The Harbor Regional Center initiated each of these annual "*Hop* reviews" by requesting court approval for Donna to remain at Fairview. The court appointed the Public Defender to serve as Donna's attorney during each *Hop* review and ultimately approved Donna's continued Fairview placement subject to "further judicial review within one (1) year."

In 2004, the trial court appointed Donna's father, Joseph, and Dennis W. Wells and Alexine M. Wells as Donna's limited conservators under the Probate Code. The court granted Joseph and his coconservators the power "to fix the residence or specific dwelling of [Donna]," give or withhold medical consent, and contract on Donna's behalf. The court has investigated and reviewed this limited conservatorship every two years, but has not found any grounds to modify or terminate it.

The Harbor Regional Center filed its most recent "*Hop* petition" in February 2011, explaining "there is no known suitable, legally available placement [for Donna] that is less restrictive than the proposed state developmental center placement." In October 2011, while that petition remained pending, the Public Defender filed a habeas corpus petition on Donna's behalf, alleging Donna's ongoing Fairview placement unlawfully restrained her personal liberty because it was not the least restrictive placement capable of meeting her needs. In April 2012, the trial court granted the habeas

5

corpus petition and directed the Harbor Regional Center to identify an available community placement for Donna within one year.

After unsuccessfully challenging the trial court's order through the Lanterman Act's administrative fair hearing process, Joseph filed a petition for writ of mandate or prohibition to prevent the trial court from ordering Donna moved to a new facility. Joseph argued the trial court's order should be vacated and the habeas corpus petition dismissed because the Public Defender lacked authority to file it on Donna's behalf. According to Joseph, all reviews concerning Donna's Fairview placement must be conducted through the Lanterman Act's administrative fair hearing process, not in court.

In August 2014, this court issued an alternative writ of mandate directing the trial court to set aside its order granting the Public Defender's habeas corpus petition, and instead "enter a new and different order (1) dismissing the habeas petition; and (2) setting a hearing on the pending *Hop* petition to review the continued placement of . . . Donna P. at Fairview Developmental Center consistent with this court's decision in *Michelle K.*"

*Michelle K.* held the Public Defender lacked standing to file a habeas corpus petition on behalf of a developmentally disabled person placed in a state developmental center, unless the Public Defender established "'"very exceptional circumstances"'" justifying the petition, such as the absence of anyone else to file it on the developmentally disabled person's behalf, and the lack of any other adequate remedy to challenge the developmental center placement. (*Michelle K.*, *supra*, 221 Cal.App.4th at pp. 420, 431-432.) In *Michelle K.*, we concluded a pending *Hop* petition provided an adequate remedy, and therefore the Public Defender generally may not pursue habeas corpus relief when a *Hop* petition is pending. (*Michelle K.*, at pp. 432-433.) As more fully explained below, *Michelle K.* also held an indefinite placement at a developmental center constitutes a significant restraint on a developmentally disabled person's

6

fundamental liberty interests, and therefore the person's due process and equal protection rights required periodic judicial review to ensure the person's disabilities continue to warrant placement in the most restrictive environment available under the Lanterman Act. (*Michelle K.*, at pp. 420-421, 438-439.)

The trial court dismissed the Public Defender's habeas corpus petition and set a status conference to discuss scheduling a trial on the Harbor Regional Center's pending *Hop* petition. At the status conference, however, the Harbor Regional Center made an oral motion to withdraw its *Hop* petition because it concluded the circumstances had changed since it originally filed the petition, and it no longer sought to maintain Donna's placement at Fairview. The Harbor Regional Center explained it could not pursue the *Hop* petition in good faith because it no longer believed Fairview was the least restrictive placement capable of meeting Donna's needs.

The trial court granted the request and allowed the Harbor Regional Center to withdraw the pending *Hop* petition over Joseph's objection and his request that the court delay ruling on the matter until he had an opportunity to brief the issue. The court explained there was no need to judicially review Donna's ongoing Fairview Placement once the Harbor Regional Center withdrew its support for that placement because Donna may not remain at Fairview without the Harbor Regional Center's approval.

After the trial court allowed the Harbor Regional Center to withdraw its *Hop* petition, the Public Defender requested the trial court also order Donna discharged from Fairview because there was no legal basis to keep her there. The Public Defender argued this additional order was necessary to place pressure on the Harbor Regional Center to work diligently to find a new placement for Donna, and also to put pressure on Joseph to cooperate with those efforts. The Harbor Regional Center supported the request.

The trial court agreed and included the following statement in its order allowing the Harbor Regional Center to withdraw its *Hop* petition: "Donna . . . is ordered

7

discharged from Fairview Developmental Center and she is to be placed into a suitable placement for her needs."  Joseph appealed.

II

DISCUSSION

A.    *The Lanterman Act and State Developmental Center Placements*

The Lanterman Act "'grants persons with developmental disabilities the right to receive treatment and services to meet their needs, regardless of age or degree of handicap, at each stage of life.'"  (*In re Michael K.* (2010) 185 Cal.App.4th 1112, 1117 (*Michael K.*).)  "The Legislature enacted the Lanterman Act to 'establish certain rights of the so-called developmentally disabled persons, primarily their entitlement to the maximum degree of personal liberty and autonomy consonant with their handicap.'"  (*Ibid.*)  "These [rights] include the 'right to treatment and habilitation services and supports in the least restrictive environment' and the 'right to dignity, privacy, and humane care,' with treatment, services and supports provided in natural community settings to the maximum extent possible."  (*Capitol People First v. State Dept. of Developmental Services* (2007) 155 Cal.App.4th 676, 682 (*Capitol People*).)

"A '"[d]evelopmental disability"' is 'a disability that originates before an individual attains age 18 years, continues, or can be expected to continue, indefinitely, and constitutes a substantial disability for that individual.'  (§ 4512, subd. (a).)  The term includes 'mental retardation, cerebral palsy, epilepsy, and autism,' but does not include 'other handicapping conditions that are solely physical in nature.'  (*Ibid.*)"  (*Michelle K.*, *supra*, 221 Cal.App.4th at p. 422.)

"The state contracts with private nonprofit corporations to establish and operate a network of 21 regional centers [including the Harbor Regional Center] that are responsible for determining eligibility, assessing needs, and coordinating and delivering direct services to developmentally disabled persons and their families.  [Citation.]  The

8

regional centers' purpose is to 'assist persons with developmental disabilities and their families in securing those services and supports which maximize opportunities and choices for living, working, learning, and recreating in the community.' [Citation.] The state 'allocates funds to the centers for operations and the purchasing of services, including funding to purchase community-based services and supports.'" (*Michelle K.*, *supra*, 221 Cal.App.4th at p. 422.)

"'The specific rights of persons with developmental disabilities and the corresponding obligations of the state are determined through an individual program plan (IPP) procedure that meets common statutory requirements. (§§ 4646-4648.) The IPP is developed by a planning team that includes the [developmentally disabled person], his or her legally authorized representative, and one or more regional center representatives. (§ 4512, subd. (j).) The goals and objectives developed through the IPP process should maximize opportunities for the individual to be part of community life; enjoy increased control over his or her life; acquire positive roles in community life; and develop the skills to accomplish the same. (§ 4646.5, subd. (a)(2).)'" (*Michelle K.*, *supra*, 221 Cal.App.4th at p. 422.) The developmentally disabled person and his or her conservator or representative are statutorily guaranteed "the opportunity to actively participate in the development of the [IPP]." (§ 4646, subd. (b).)

"Before July 1, 2012, a nondangerous, developmentally disabled person could be admitted to a state developmental center in two ways. First, the person could submit a written admission application if he or she 'is in such condition of mind as to render him competent to make [the application].' (§ 6000, subd. (a)(1).) Second, section 4825 authorized admission 'upon the application of the person's parent or conservator in accordance with the provisions of Sections 4653 and 4803.' (See § 6000.5.) Section 4653 states 'no developmentally disabled person shall be admitted to a state hospital except upon the referral of a regional center.' Section 4803 provides that a regional center may not recommend admission of a developmentally disabled person to

9

a community care or health facility unless the regional center certifies the person to be admitted or the person's parent or conservator does not object. Section 4825 does not limit the length of a developmentally disabled person's commitment, nor does it require judicial review of the placement." (*Michelle K.*, *supra*, 221 Cal.App.4th at pp. 422-423.)

"Effective July 1, 2012, the Legislature amended the Welfare and Institutions Code to prohibit nondangerous, developmentally disabled persons from being admitted to state developmental centers. (§§ 4507, 7505.) Section 7505 now provides that a person shall *not* be admitted to a state developmental center unless the person is developmentally disabled *and* the person is (1) committed by a court to Fairview Developmental Center because the person is a danger to self or others under section 6500 and is suffering an acute crisis as defined in section 4418.7; (2) committed by a court to the Porterville Developmental Center's secure treatment program through the criminal justice system or juvenile court system; or (3) a prior resident of a developmental center who was provisionally released no more than 12 months earlier." (*Michelle K.*, *supra*, 221 Cal.App.4th at p. 423.)

"These recent Welfare and Institutions Code amendments do not require moving nondangerous, developmentally disabled persons living in a state developmental center on July 1, 2012, to a different facility. Instead, the amendments require the regional center responsible for the committee to conduct a comprehensive assessment and 'identify the types of community-based services and supports available to the [person].' (§ 4418.25, subd. (c)(2)(A) & (B).) The regional center must then provide the assessment to the individual program planning team to assist it in determining the least restrictive environment for the committee. (§ 4418.25, subd. (c)(2)(D).)" (*Michelle K.*, *supra*, 221 Cal.App.4th at p. 423.) The Legislature required the regional center to complete this assessment by December 31, 2015 (§ 4418.25, subd. (c)(2)(C)), and the assessment must be "updated annually as part of the individual program planning process for as long as the [developmentally disabled person] resides in the developmental center" (§ 4418.25,

10

subd. (c)(2)(E)).  When a community-based placement is identified and selected, all necessary services and supports must be in place before transferring a nondangerous, developmentally disabled person from a developmental center to the community-based living arrangement.  (§ 4418.3, subd. (a).)

"[T]he Lanterman Act guarantees an applicant for or recipient of services or his or her representative 'who is dissatisfied with any decision or action of [a regional center]' the right to an administrative fair hearing.  (§ 4710.5, subd. (a).)  The statute also provides detailed provisions for claimants who wish to attempt to resolve the issue through a voluntary informal meeting or through voluntary mediation before proceeding to an administrative fair hearing.  (§§ 4710.5, subd. (a); 4710.6, subds. (a), (b); 4710.7; 4710.8; 4710.9; 4711.5.)"  (*Conservatorship of Whitley* (2007) 155 Cal.App.4th 1447, 1459-1460 (*Whitley*).)

"The [Department of Developmental Services] is required to 'contract for the provision of independent hearing officers' to conduct the hearing.  (§ 4712, subd. (b).)  The hearing officer is required to have special training in the law applicable to the developmentally disabled and the services available to them and the law of administrative hearings.  (§§ 4710.5, subd. (a); 4712, subd. (b).)  The agency awarding the contract for independent hearing officers 'shall biennially conduct, or cause to be conducted, an evaluation of the hearing officers who conduct' administrative fair hearings.  (§ 4712, subd. (n).)"  (*Whitley*, *supra*, 155 Cal.App.4th at p. 1460.)

The Lanterman Act guarantees the claimant a prehearing exchange of potential witnesses and documentary evidence, the opportunity to present witnesses and evidence, the opportunity to cross-examine witnesses, the right to appear through counsel or other representatives, and the right of access to records.  (*Whitley*, *supra*, 155 Cal.App.4th at p. 1460; see *Michelle K.*, *supra*, 221 Cal.App.4th at p. 424.)  Absent a showing of good cause, the regional center presents its witnesses and all other evidence first followed by the claimant's presentation of his or her case.  (§ 4712, subd. (j);

11

*Whitley*, at p. 1460.) A recording of the proceedings must be made at public expense. (§ 4712, subd. (k); *Whitley*, at p. 1460.)

"Within 10 working days of the fair hearing, the hearing officer must 'render a written decision' containing 'a summary of the facts, a statement of the evidence from the proceedings that was relied upon, a decision on each of the issues presented, and an identification of the statutes, regulations, and policies supporting the decision.' (§ 4712.5, subds. (a) & (b).)" (*Whitley*, *supra*, 155 Cal.App.4th at pp. 1460-1461.) "Either side may seek judicial review of the administrative decision through a writ of administrative mandamus." (*Michelle K.*, *supra*, 221 Cal.App.4th at p. 424.)

In *Hop*, the Supreme Court examined the constitutionality of section 4825, which was the Lanterman Act provision that previously allowed a developmentally disabled person to be indefinitely confined in a state developmental center based on a request by the person's parent or conservator, a recommendation by a regional center, and the absence of any objection from the person or the person's representative. (*Hop*, *supra*, 29 Cal.3d at pp. 87-88; *Michelle K.*, *supra*, 221 Cal.App.4th at pp. 426-427.) The *Hop* court explained personal liberty is a fundamental right both the United States and California Constitutions guarantee to all individuals, including developmentally disabled individuals, and placing a person in a developmental center is a significant restraint on the person's liberty interests because it is essentially a civil confinement. This restraint therefore required application of criminal due process standards to test the confinement's validity, including a judicial hearing to determine whether the person's disabilities warranted the confinement. (*Hop*, at pp. 89, 92; *Michelle K.*, at p. 427.)

The *Hop* court also concluded a developmentally disabled person's equal protection rights required a judicial hearing before confining the person in a state development center under section 4825. No other similarly situated adult in need of protective custody lawfully could be placed in a developmental center without a judicial

12

determination the placement was appropriate, including proposed conservatees under the Lanterman-Petris-Short Act (LPS Act; § 5000 et seq.) and proposed committees under section 6500 et seq., both of whom have a statutory right to judicial review before being confined in a developmental center. (*Hop*, *supra*, 29 Cal.3d at pp. 92-94; *Michelle K.*, *supra*, 221 Cal.App.4th at p. 428.) The *Hop* court therefore imposed *preconfinement* judicial review as a constitutional safeguard to ensure section 4825 placement in a developmental center did not deprive a developmentally disabled person of his or her personal liberty without due process and equal protection of the laws. This review includes the right to a jury trial on demand, application of the beyond reasonable doubt standard of proof, and the right to appointed counsel. (*Hop*, at pp. 93-94; *Michelle K.*, at p. 428.) Without this review, the Supreme Court explained placement under section 4825 would be unconstitutional. (*Michelle K.*, at p. 428.)

In *Michelle K.*, we concluded a developmentally disabled person's fundamental right to personal liberty also required periodic judicial review of an *ongoing* section 4825 developmental center placement to ensure the person's disabilities continued to warrant the placement. We explained, "The impairment of the committee's personal liberty is not diminished by residing in the developmental center for an extended period of time, especially when there are continuing advancements in both the treatment of numerous disabilities and the availability of less restrictive services in community-based and other facilities. No other class of similarly situated adults may lawfully remain in a state developmental center indefinitely without further judicial review of their ongoing placement. For example, the LPS Act and section 6500 et seq. place limits on the length of confinement for a gravely disabled person or a person believed to be a danger to self or others, and both statutory schemes also require judicial review to recommit the person or extend the initial confinement. [Citations.] [¶] The Lanterman Act does not limit the length of a section 4825 placement or require judicial review of the placement. Accordingly, unless *Hop* requires a further judicial review of a section 4825

13

placement, Michelle and others similarly situated could face a lifetime placement in a developmental center based solely on an initial judicial determination regarding the placement's suitability. . . . That result is simply inconsistent with the constitutional principles articulated in *Hop*." (*Michelle K.*, *supra*, 221 Cal.App.4th at pp. 438-439.)

We emphasized periodic *Hop* reviews are limited to determining whether the developmentally disabled person's disabilities continue to justify the restraints on the person's fundamental liberty interests that are inherent in a state developmental center placement. (*Michelle K.*, *supra*, 221 Cal.App.4th at p. 443.) The jurisdiction to conduct these reviews "does not confer or create jurisdiction to monitor the ongoing placement or make decisions regarding the details of the services the developmentally disabled person receives." (*Id*. at p. 441.)

B.     Michelle K. *Did Not Require the Trial Court to Review Donna's Ongoing Fairview Placement After the Harbor Regional Center Withdrew Its* Hop *Petition*

Joseph contends *Michelle K.* required the trial court to conduct a periodic *Hop* review of Donna's ongoing Fairview placement even after the Harbor Regional Center withdrew its *Hop* petition and no longer supported that placement. According to Joseph, *Michelle K.* established that all developmentally disabled persons have a constitutional right to periodic judicial review of their placement in a state developmental center while confined there. Joseph misconstrues *Michelle K.* and the statutory scheme governing developmental center placement under the Lanterman Act.

*Michelle K.* did not establish a constitutional right to judicial review of the services and supports a developmentally disabled person receives under the Lanterman Act. Rather, *Michelle K.* requires periodic judicial reviews for the limited purpose of determining whether a developmentally disabled person's disabilities continue to justify the restraint on personal liberty inherent in a placement at the most restrictive facility available under the Lanterman Act. (*Michelle K.*, *supra*, 221 Cal.App.4th at pp. 441-442.) As we explained, the purpose of periodic *Hop* reviews is to ensure a

14

developmentally disabled person's representative, a regional center, and a developmental center do not unconstitutionally deprive the person of his or her liberty by keeping the person indefinitely confined in a developmental center without any independent review. (*Michelle K.*, at p. 443.) The periodic judicial review *Hop* and *Michelle K.* require is a constitutional safeguard designed to render an otherwise unconstitutional statutory scheme constitutional; it is not a procedural mechanism to help a developmentally disabled person enforce his or her right to receive certain services and supports under the Lanterman Act. (*Michelle K.*, at pp. 428, 441; see *Hop*, *supra*, 29 Cal.3d at pp. 92-94; *Michael K.*, *supra*, 185 Cal.App.4th at 1128, quoting *In re Borgogna* (1981) 121 Cal.App.3d 937, 946 ["*Hop* does not address the issue 'where the [regional] center seeks to deescalate or make less restrictive the placement, but the ward opposes such a transfer'"].)

Once the Harbor Regional Center withdrew its support for Donna's placement at Fairview, *Hop* and *Michelle K.* no longer required judicial review to ensure Donna's disabilities justified her ongoing confinement in a state developmental center because Donna may not remain at Fairview without the Harbor Regional Center's approval. As explained above, the Harbor Regional Center is responsible for determining Donna's eligibility to receive Lanterman Act services and supports, assessing her needs, and coordinating and delivering her services and supports. (*Michelle K.*, *supra*, 221 Cal.App.4th at p. 422; *Capitol People*, *supra*, 155 Cal.App.4th at pp. 682-683.) Donna could not be admitted to Fairview without the Harbor Regional Center's approval, nor could her admission be renewed without its approval. (See § 4653; *Hop*, *supra*, 29 Cal.3d at p. 87; *Michelle K.*, at pp. 423, 426-427.)[3]

---

[3]  Because section 4653 states "no developmentally disabled person shall be *admitted* to a state hospital except upon the referral of a regional center" (italics added), Joseph contends the section only applied to Donna's initial admission to Fairview, and therefore he may maintain Donna's Fairview placement without the Harbor Regional Center's approval. Joseph cites no authority to support this contention, and ignores the

15

Although Joseph contends the trial court must review Donna's Fairview placement because he believes it is the least restrictive placement capable of meeting her needs, he lacks the authority to keep her at Fairview without the Harbor Regional Center's approval, and therefore a periodic *Hop* review is unnecessary. He relies on his authority as Donna's limited conservator to fix her residence, but he was appointed her conservator under the Probate Code, and Probate Code conservators lack the authority to place a conservatee in a state developmental center without court approval.[4] (See *Michelle K.*, *supra*, 221 Cal.App.4th at pp. 425, fn. 3, 429; *People v. Karriker* (2007) 149 Cal.App.4th 763, 779-780.) Joseph also points to his statutory right as Donna's conservator to actively participate in the individual program planning process required to identify the services and supports the Harbor Regional Center will provide or arrange for Donna. (See § 4646, subd. (b).) That right of participation, however, merely ensures Joseph has the opportunity to provide input regarding Donna's placement; it does not allow him to override the Harbor Regional Center's placement determination reached through the individual program planning process. (See *Capitol People*, *supra*, 155 Cal.App.4th at pp. 698-699 ["while the Lanterman Act does demonstrate an intent to include family members and conservators in the decision-making process affecting persons with disabilities [citations], it provides them scant concrete rights"].)

---

Harbor Regional Center's responsibilities to determine eligibility, assess needs, and coordinate and deliver services and supports. Moreover, Joseph overlooks that Donna has remained at Fairview based on a series of court orders authorizing placement for one year subject to further court approval. Each time the Harbor Regional Center applied for court approval it therefore was essentially a new placement. (See *Michelle K.*, *supra*, 221 Cal.App.4th at pp. 437-438.)

[4]    Prior to July 1, 2012, a conservator appointed under the LPS had authority to place a conservatee in a state developmental center or other locked treatment facility if the conservator determined it was the least restrictive placement. (*Michelle K.*, *supra*, 221 Cal.App.4th at p. 425.) The 2012 amendments to the Welfare and Institutions Code withdrew that authority. (*Ibid.*)

The Harbor Regional Center's withdrawal of its *Hop* petition and support for Donna's ongoing Fairview placement therefore transformed this matter from an independent review to ensure the placement's constitutionality into a dispute between Joseph and the Harbor Regional Center about which specific facility provides the least restrictive placement capable of meeting Donna's needs. That dispute is not the proper subject of a periodic *Hop* review. (See *Michelle K.*, *supra*, 221 Cal.App.4th at p. 444 [periodic *Hop* review "is limited to deciding whether appropriate efforts have been made to identify a less restrictive facility that satisfies all of Michelle's needs and whether at least one such facility exists"].)

The Lanterman Act's "fair hearing procedures provide the exclusive remedy for a developmentally disabled person's legal representative to object to a community placement decision." (*Michelle K.*, *supra*, 221 Cal.App.4th at p. 442; see *Michael K.*, *supra*, 185 Cal.App.4th at pp. 1125-1126; *Whitley*, *supra*, 155 Cal.App.4th at pp. 1462-1464.) In *Michael K.* and *Whitley*, the Courts of Appeal held a dispute over whether a developmentally disabled person should remain in a state developmental center or be transferred to a community-based placement must be resolved through the Lanterman Act's fair hearing process, and judicial review may be sought only after exhausting that exclusive administrative remedy. (*Michael K.*, at pp. 1116-1117, 1125-1126; *Whitley*, at pp. 1455-1457, 1462-1464.) As the *Whitley* court explained, this conclusion is compelled by the comprehensive nature of the administrative procedures the Lanterman Act establishes, the Legislature "expressly making [the] fair hearing [process] the exclusive remedy for issues relating to the provision of services" under the Lanterman Act, and the common law exhaustion of administrative remedies doctrine, which makes "'exhaustion of the administrative remedy . . . a jurisdictional prerequisite to resort to the courts.'" (*Whitley*, at p. 1463.)

In deciding *Michelle K.*, we took care to distinguish between the nature and purpose of a periodic *Hop* review, and the nature and purpose of the administrative fair

17

hearing process: "*Hop* requires periodic independent reviews to ensure a section 4825 developmental center placement does not violate a developmentally disabled person's constitutional rights. The reviews ensure the person's disabilities continue to warrant placement in the most restrictive environment available under the Lanterman Act. In contrast, the fair hearing procedures provide an administrative process for a developmentally disabled person or her representative to challenge a regional center's or developmental center's decision to change the person's placement or other services. Through the process, a mediator or hearing officer with subject matter expertise resolves specific challenges to a decision changing the services the developmentally disabled person receives." (*Michelle K.*, *supra*, 221 Cal.App.4th at p. 443.) *Michelle K.* therefore did not require the trial court to conduct a periodic *Hop* review after the Harbor Regional Center withdrew its support for Donna's ongoing Fairview placement. Instead, under *Michelle K.* Joseph may invoke the fair hearing process once the Harbor Regional Center identifies a specific facility as Donna's new placement.

Joseph also contends *Michelle K.* required the trial court to review Donna's Fairview placement because it has been more than five years since Donna's placement has been judicially reviewed because of the delays in resolving earlier disputes. The periodic judicial review mandated by *Michelle K.*, however, is forward looking, asking whether Donna's disabilities continue to justify her ongoing placement at Fairview. The Harbor Regional Center already has answered that question by withdrawing its *Hop* petition and asserting Donna's disabilities do not warrant her continued placement at Fairview. A periodic *Hop* review therefore is not necessary to make that determination, and, as explained above, the dispute between Joseph and the Harbor Regional Center about the appropriate placement for Donna must be resolved through the Lanterman Act's fair hearing process.

Moreover, Donna's constitutional rights are not violated by the delays inherent in the process of identifying and moving her to the least restrictive facility

18

capable of meeting her needs. As we recognized in *Michelle K.*, Donna "should not be transferred until all issues regarding her new placement are resolved [because] . . . '"[her] precipitous release . . . to [her] famil[y or] a[] community facilit[y] unprepared to care for [her] could be both disruptive to [her] treatment program and potentially harmful to [Donna] and the community."'" (*Michelle K.*, *supra*, 221 Cal.App.4th at p. 444.) The Welfare and Institutions Code also prohibits Donna's transfer to a new facility until all necessary services and supports are in place. (§ 4418.3, subd. (a).) If the delays inherent in finding a new placement for Donna and transitioning her to it become excessive or unreasonable, then Joseph, or the Public Defender if it can make the showing we described in *Michelle K.* (*Michelle K.*, *supra*, 221 Cal.App.4th at pp. 431-432), may petition on Donna's behalf for habeas corpus relief to compel judicial review of the efforts to move Donna to a new facility.[5]

The record does not reveal whether the Harbor Regional Center has identified a specific community-based facility that it contends is capable of meeting Donna's needs.[6] The 2012 amendments to the Welfare and Institutions Code required the Harbor Regional Center to conduct a comprehensive assessment of Donna's needs and identify the types of community-based services and supports that are capable of meeting those needs. (§ 4418.25, subd. (c)(2)(A) & (B).) The Harbor Regional Center was required to complete that assessment by the end of 2015, and then to share it with Donna's individual program planning team to assist it in determining the least restrictive

---

[5] There is no need for the Harbor Regional Center to seek habeas corpus relief on Donna's behalf because it can overcome any delays injected into the process by Joseph or anyone else by determining Donna should be transitioned to a particular facility and thereby compelling Joseph to invoke the fair hearing process to challenge that determination.

[6] In the trial court, the Public Defender identified two facilities as less restrictive facilities capable of meeting Donna's needs, but there is no indication the Harbor Regional Center agreed those facilities were capable of meeting Donna's needs.

19

placement available for her. (§ 4418.25, subd. (c)(2)(C) & (D).) We presume the Harbor Regional Center has performed its statutory duties, and if it has not, Joseph, or potentially the Public Defender, may bring an action to compel the Harbor Regional Center to do so. A periodic *Hop* review, however, may not be used for that purpose.

Finally, Joseph contends the trial court should have proceeded with the periodic *Hop* review because *Michelle K.* recognized Joseph's due process right to have a jury determine whether Donna should remain at Fairview regardless of Harbor Regional Center's position. Not so. *Michelle K.* addressed Donna's constitutional rights as a developmentally disabled person confined in a state developmental center under the Lanterman Act. Although Joseph may exercise some of Donna's rights as her conservator, the rights belong exclusively to Donna. (*Capitol People*, *supra*, 155 Cal.App.4th at p. 699 ["under the Lanterman Act it is the individual with a developmental disability—not his or her family, friends, or conservator—who is afforded all the legal rights and responsibilities guaranteed by the United States and California Constitutions"].) Nothing we said in *Michelle K.* recognized any right in Joseph to have a jury determine Donna's proper placement. Any conclusion to the contrary would allow Joseph to circumvent the Lanterman Act's fair hearing process as the exclusive means for resolving disputes about the proper services and placement for a developmentally disabled person.[7]

---

[7] Joseph also contends the trial court violated the alternative writ we issued by allowing the Harbor Regional Center to withdraw its *Hop* petition and failing to conduct a periodic *Hop* review regarding Donna's Fairview placement. Not so. Our writ merely instructed the trial court to set a hearing on the Harbor Regional Center's pending *Hop* petition. Once the Harbor Regional Center withdrew its petition and support for Donna's continued placement at Fairview, there was nothing about which the trial court could conduct a hearing because, as explained above, Donna may not remain at Fairview without the Harbor Regional Center's approval.

C.      *The Trial Court Erred In Ordering Donna Discharged from Fairview*

In allowing the Harbor Regional Center to withdraw its *Hop* petition, the trial court also ordered Donna discharged from Fairview and placed in a facility suitable to her needs.  The trial court made this additional order at the Public Defender's and the Harbor Regional Center's request.  Neither of those parties, however, has seen fit to file a brief in this court to justify that order.

We reverse this aspect of the trial court's order because no legal basis authorized the court to order Donna discharged from Fairview without the Harbor Regional Center identifying a specific, less restrictive facility capable of accepting Donna and meeting her needs.  As explained above, the Welfare and Institutions Code prohibits the transfer of a developmentally disabled person from a developmental center to another facility unless all necessary services and supports are in place at that new facility. (§ 4418.3, subd. (a); see *Michelle K.*, *supra*, 221 Cal.App.4th 444.)  That cannot occur when the facility itself has not been identified.

III

DISPOSITION

The order is affirmed in part and reversed in part.  The portion of the order allowing the Harbor Regional Center to withdraw its *Hop* petition and declining to conduct a periodic *Hop* review is affirmed.  The portion of the order discharging Donna

21

from Fairview is reversed. In the interest of justice, all parties shall bear their own costs on appeal.


                                    ARONSON, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


FYBEL, J.